UTAH POWER & LIGHT CO., MINING DIVISION, Petitioner,

v.

SECRETARY OF LABOR and Federal Mine Safety and Health Review Commission, Respondents.

No. 90–9538.

United States Court of Appeals, Tenth Circuit.

Dec. 27, 1991.

Colleen A. Geraghty, Robert P. Davis, Sol. of Labor, Edward P. Clair, Associate Sol., Dennis D. Clark, Appellate Litigation, Div., Dept. of Labor, Washington, D.C., for respondents.

Thomas C. Means, Timothy M. Biddle, Susan E. Chetlin, of Crowell & Moring, Washington, D.C., for petitioner.

Before BALDOCK and McWILLIAMS, Circuit Judges, and DUMBAULD *, Senior District Judge.

DUMBAULD, Senior District Judge.

Petitioner Utah Power and Light Co. attacks the decision of the Federal Mine Safety and Health Review Commission in the Department of Labor [1] determining that petitioner violated applicable requirements prohibiting accumulation of loose coal and coal dust in its Cottonwood Mine in Utah.[2] We affirm.

In the Federal Coal Mine Health and Safety Act of December 30, 1969,[3] 83 Stat. 742–743, 30 U.S.C. 801 et seq., the Congress declared as national policy, in Section 2 of the Act:

(a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner;

*    *    *    *    *    *

(d) the existence of unsafe and unhealthful conditions and practices in the Nation's coal mines is a serious impediment to the future growth of the coal mining industry and cannot be tolerated;

*    *    *    *    *    *

(f) the disruption of production and the loss of income to operators and miners as a result of coal mine accidents or occupationally caused diseases unduly impedes and burdens commerce; and

*    *    *    *    *    *

(g) it is the purpose of this Act (1) to establish interim mandatory health and safety standards and to direct the [pro-mulgation of] improved mandatory health or safety standards to protect the health and safety of the Nation's coal miners; (2) to require that each operator of a coal mine and every miner in such mine comply with such standards; ...

More specifically, Section 304(a) of the Act, 83 Stat. 774, 30 U.S.C. 864(a), provided that:

Coal dust, including float coal dust deposited on rock-dusted surfaces, loose coal, and other combustible materials, shall be cleaned up and not be permitted to accumulate in active workings, or on electric equipment therein.

In accordance with the intention of Congress as declared in Section 2(g)(1) of the Act, 30 U.S.C. 801(g)(1), the current mandatory safety standards promulgated include 30 C.F.R. 75.400, in the very words of Section 304(a) quoted above; and also 30 C.F.R. 75.400–2 providing that:

A program for regular cleanup and removal of accumulations of coal and float coal dusts, loose coal, and other combustibles shall be established and maintained. Such program shall be available to the Secretary or authorized representative.[4]

With respect to ventilation of the mine, 30 C.F.R. 75–300 provides:

All coal mines shall be ventilated by mechanical ventilation equipment installed and operated in a manner approved by an authorized representative of the Secretary and such equipment shall be exam-

---

* The Honorable Edward Dumbauld, United States Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. The Commission is established by 30 U.S.C. 823, and its decisions are reviewable by this Court pursuant to 30 U.S.C. 816(a)(1), applying the standard of "substantial evidence upon the record as a whole" with respect to "questions of fact." As to questions of law our review is plenary.

2. The Commission's decision is found in Appendix [hereinafter "App."] to Petitioner's Brief, tab 1. It upheld, in pertinent part, the decision of Administrative Law Judge John J. Morris, sustaining Order No. 2876489 pursuant to a citation issued by mine inspector Donald Gibson.

3. Now known as the Federal Mine Safety and Health Act of 1977.

4. It will be noted that this regulation does not require that a company's cleanup program be approved by any governmental agency, but merely that it be available to mine inspectors. When petitioner sent a copy of its program to the Mine Safety and Health Administration it was returned. Petitioner's brief p. 14, p. 32. On the other hand, the company's ventilation program must be approved by the Coal Mine Safety District Manager. See 30 C.F.R. 75.300, and 75.316–1 and 2, infra. These provisions are derived from 30 U.S.C. 863(a) and (o).

ined daily and a record shall be kept of such examination.

Likewise, CFR 75–316 provides:

A ventilation system and methane and dust control plan and revisions thereof suitable to the conditions and the mining system of the coal mine and approved by the Secretary shall be adopted by the operator and set out in printed form on or before June 28, 1970. The plan shall show the type and location of mechanical ventilation equipment installed and operated in the mine, such additional or improved equipment as the Secretary may require, the quantity and velocity of air reaching each working face, and such other information as the Secretary may require. Such plan shall be reviewed by the operator and the Secretary at least every 6 months.

Civil penalties up to $10,000 for each violation of a mandatory health or safety standard may be imposed in accordance with 30 U.S.C. 820(a) and (i).

The facts giving rise to the case at bar are clear and uncontested. As stated in petitioner's brief, ventilation of the mine entry face, where mining is currently being done, "is a preeminent safety concern."[5]

To ventilate a development entry, intake air is forced down the main portion of the entry (bounded by the right rib and the line curtain[6] on the left) until the air reaches the face. The air sweeps the face and flows around the end of the curtain, exiting out the air course formed by the curtain and the left rib.[7]

On March 20, 1989, Donald E. Gibson, Department of Labor Mine Safety and Health Administration Inspector, in the course of his official duty in accordance with law was inspecting the Cottonwood Mine and noticed an accumulation of loose coal between the left rib and the line curtain.

He measured the accumulation and found it was 104.5 feet in length, 14 to 31 inches in depth, and 12 to 14 inches in width, and weighed approximately 500 to 800 pounds.

Finding that this condition was likely to cause serious injury (he noted that the electrical mining machine operated by radio remote control and a trailing cable supplying 950 volts AC were operated on the left side where the accumulation was) he found a serious and substantial violation of mandatory safety regulation 30 CFR 75.400, and issued Citation/Order #2876489.[8]

Petitioner has from the beginning doggedly urged its contention that it can not be found guilty of violating the requirements prohibiting accumulation so long as it complies with its "cleanup plan" which contemplates cleanup at such time as a new cross-cut intersects the entry.[9]

It rankles Petitioner's craw that prior to the instant violation upon which Inspector Gibson issued Citation/Order #2876489 dated 3/20/89, a prior and different violation had been cited by a different inspector because petitioner had rolled up the line curtain (in order to clean up an accumulation of loose coal and coal dust) in such a way as to interfere with ventilation.[10]

---

5. Petitioner's brief, p. 5.

6. The "line curtain" or "brattice" is made of fire resistant canvas or duck and extends from roof to floor, creating passages through which the air is forced by mechanical ventilation equipment (fans). *Ibid.*, p. 7.

7. *Ibid.*, p. 5.

8. This Citation/Order (issued under 30 U.S.C. 814) is attachment A to Respondent's Brief. Gibson and ALJ Morris also found the operator guilty of "unwarrantable failure" to comply with 75.400. See Morris Decision of April 24, 1989,

App. tab C, 719, 729. The Commission's Decision reversed that holding, finding that Respondent entertained a mistaken but *bona fide* belief in its "cleanup plan defense." The "unwarrantable failure" issue is therefore not before us on this appeal.

9. Respondent's brief, p. 10. The same argument was made to the mine inspector, the ALJ, and the commission, but rejected (and rightly so, in our view, as will be set forth *infra*).

10. Inspector Dick Jones issued Citation #3296223 for failure to maintain ventilation at the mining face. Respondent's brief, p. 11. See note 4, *supra*.

■ It seems clear that the prohibition against accumulation (embodied in both statute and regulation) has independent significance. Petitioner's contentions that it is void for vagueness or arbitrariness,[11] or is somehow merged into or limited by the requirement of a cleanup plan (so that the plan formulated by the company constitutes a "safe harbor" superseding the prohibition against accumulations unless and until the Mine Safety and Health Administration points out defects in the cleanup plan),[12] are utterly unpersuasive.

Quite rightly "the Commission rejected UP & L's defense that compliance with § 75.400–2 constituted compliance with § 75.400 under the circumstances of this case."[13]

As the Commission stated:

UP & L contends that it cannot be cited for a violation of section 75.400 because it was complying with its section 75.400–2 cleanup program. We disagree. Section 75.400–2 implements section 75.400, not vice versa. A cleanup plan cannot establish procedures that allow coal and other combustible materials to accumulate in violation of section 75.400. In agreement with the [ALJ], we hold that an operator cannot avoid a finding of violation of section 75.400 by arguing that it was merely following a section 75.400–2 cleanup plan that it had established.[14]

It is true that 30 CFR 75.400–2 adds to the requirements of 30 U.S.C. 864(a) regarding accumulations[15] the additional requirement of preparing and maintaining a cleanup plan,[16] but the addition does not affect in any way the content or scope of the mandate of § 864(a).

The added requirement is simply pedagogical or prophylactic, designed to bring the mandate of § 864(a) more emphatically to the attention of the mine managers.[17]

■ Likewise unmeritorious is Petitioner's claim that the Commission's decision confronts the coal company with a catch–22 or Scylla and Charybdis situation: that if the company tries to avoid a "Gibson-type" violation with respect to accumulations, they will face a "Jones-type" violation of ventilation standards.

This complaint (ignoring the company's duty both to clean up coal dust *and* to provide adequate air flow which, fortunately for the safety of persons working in a mine, are not incompatible goals) brings to mind the hypocritical lament of railroads some years ago that they should not be required to obey the Antitrust laws since they were subject to regulation under the Interstate Commerce Act. As stated in a law review article:

Congress did not contemplate that carriers should be relieved from the requirements of the antitrust laws merely because additional requirements were imposed by the Interstate Commerce Act ... It is plain that the carriers are subject to and must obey both statutes. To complain that this places the carriers un-

---

11. Petitioner's brief, p. 33 *et seq.* It is amazing that petitioner should make these arguments with respect to the language of 30 U.S.C. 864(a), embodied verbatim in 30 CFR, 75–400. The meaning of the mandate is certainly obvious and plainly intelligible to an experienced and capable mine management. Indeed, the language might well be thought clearly understandable by a layperson who had never been in a coal mine. While everyone knows that loose coal is generated by mining in a coal mine, the regulation plainly prohibits permitting it to accumulate; hence it must be cleaned up with reasonable promptness, with all convenient speed.

12. *Ibid.,* p. 30. No official review of a cleanup plan is required. See note 4, *infra.*

13. *Ibid.,* p. 19.

14. App. tab 1, p. 5.

15. Repeated verbatim in 30 CFR 400.

16. As stated in *U.S. v. Finley Coal Co.,* 493 F.2d. 285, 290 (6th Cir.1974). It is difficult to perceive how *Finley* helps petitioner's case in any way. It simply held that certain regulations (including the then version of the section relied on by petitioner) were invalid because not adopted in accordance with specified procedural requirements.

17. Just as Congress sometimes emphasizes the importance of speedy disposition of cases in court by calling upon the courts to take time from the actual trial of cases and spend it devising plans for the speedy trial of cases.

der two masters, or supersedes the regulatory functions of the Interstate Commerce Commission by "regulation by the Antitrust Division," is to ignore the terms of the pertinent legislative provisions and to indulge in a play upon words. One might as well argue that for the same reason, as a regulated industry subject to the Interstate Commerce Act, the railroads are relieved from the operation of the internal revenue laws.[18]

This is not only evident as a matter of common sense, but supported by the evidence of experienced witnesses and the decisions of the ALJ and the Commission (whose expertise on matters of fact we are called upon by 30 U.S.C. 816(a)(1) to respect).[19] One simple method is to hang the line curtain a little farther out from the rib. The air flow is thus not impeded, but the dangerous accumulation of coal dust can be removed.[20]

If petitioner's reliance upon the cleanup plan were tolerated, weeks or months might pass before a new cross-cut might be completed and reach the entry. Inspector Gibson estimated that by that time the accumulation of coal might well have doubled in size, creating a pile almost 210 feet long.[21]

The unacceptability of Petitioner's argument is graphically illustrated by the testimony of Petitioner's mine manager, quoted in Respondent's Brief:

> In the present case, if compliance by UP & L with its cleanup program constituted per se compliance with 30 C.F.R. 75.400 as well, under the present wording of the program there would be no time limit on when it would have to remove accumulations. The program only specifies that cleanup will take place after the connecting crosscut is cut. The accumulations in this case existed over a weekend before they were cited by Inspector Gibson. There is nothing in the record as to when, or if, the next cros-

scut was ever cut, so there is no telling how long the accumulations would have been allowed to remain. This is confirmed by the testimony of John Boylen, UP & L's mine manager:

> Q. And if it was the Friday before [the last time mining was conducted in the area], when was your understanding that material was required to be cleaned up?
>
> A. When the continuing crosscut is made.
>
> Q. Even if it takes two weeks?
>
> A. *Even if it takes two weeks or two years.* When the connecting crosscut is made. (emphasis added).

In addition, as the Commission found, "uncontroverted testimony" established that the amount of loose coal cited "would double in size from [its current] length of 104 feet to approximately 210 feet" before the next crosscut was driven and the coal cleaned up under UP & L's cleanup plan. [Citations omitted] ...

UP & L's argument must be rejected because it allows hazardous accumulations of combustible materials to exist and defeats the purpose of the statutory standard—protecting miners from explosion and fire hazards.[22]

Accordingly we conclude that the Commission's decision should be upheld and affirmed, since it correctly construes the pertinent statutory provisions and duly promulgated regulations, and its determinations as to questions of fact are amply supported by substantial evidence on the record as a whole.

AFFIRMED.

---

18. Dumbauld, "Rate–Fixing Conspiracies in Regulated Industries," 95 U. of Pa.L.Rev. 643, 648 (1947).

19. See note 1, *supra.*

20. Commission decision, App. tab 1, pp. 3, 8.

21. *Ibid.,* pp. 2, 5.

22. Respondent's Brief, p. 17.