

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-2008

# Cumberland Coal Res v. Secretary of Labor

Precedential or Non-Precedential: Precedential

Docket No. 06-4192

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

## Recommended Citation

"Cumberland Coal Res v. Secretary of Labor" (2008). *2008 Decisions.* Paper 1496.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1496

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 06-4192
_____

CUMBERLAND COAL RESOURCES, LP,

Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW
COMMISSION;
SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION, (MSHA)

Respondent.
_____

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission
(No. PENN 2004-73-R, 2004-74-R, 2004-75-R, 2004-85-R,
2004-86-R, 2004-87-R, 2004-88-R, 2004-104-R
2004-105-R, 2004-181, 2005-8)
_____

Argued November 8, 2007

Before:  SCIRICA, *Chief Judge*, AMBRO and JORDAN,
*Circuit Judges*

(Filed  February 15, 2008)
_____

Karen L. Johnston
Jackson Kelly
1099 18th Street - #2150
Denver, CO   80202

R. Henry Moore   [ARGUED]
Jackson Kelly
401 Liberty Avenue - #1340
Pittsburgh, PA   15222
        *Counsel for Petitioner*

John T. Sullivan
Federal Mine Safety & Health Review Commission
601 New Jersey Avenue, NW - #9500
Washington, DC   20001

Melissa Bowman   [ARGUED]
United States Department of Labor
Office of the Solicitor
1100 Wilson Blvd. - 22nd Fl.
Arlington, VA   22209
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge.*

Cumberland Coal Resources, LP ("Cumberland") petitions for review of the August 29, 2006 decision of the Federal Mine Safety and Health Review Commission (the "Commission") affirming the decision of an Administrative Law Judge (the "ALJ") that upheld three citations issued to Cumberland by inspectors of the Federal Mine Safety and Health Administration ("MSHA") on January 16, 2004, February 4, 2004, and February 7, 2004. *Cumberland Coal Resources, LP v. Sec'y of Labor, Mine Safety & Health Admin.*, 27 F.M.S.H.R.C. 295 (2005) (ALJ) ("*Cumberland I*"), *aff'd*, 28 F.M.S.H.R.C. 545 (2006) ("*Cumberland II*"). We will deny the petition, and in so doing affirm the Commission's decision.

## I.    BACKGROUND

### A.    *Factual Background*

#### 1.    *Longwall Mining and Bleeder Ventilation*

This case grows out of problems encountered while Cumberland was using a technique called "longwall mining" to extract coal from a mine in Greene County, Pennsylvania. Longwall mining involves the use of cutting machines to shear coal from one face of a large rectangular block, or

panel, of coal.  In preparing to engage in longwall mining, a number of tunnels, sometimes called "entries," are created in a coal seam, offsetting the block of coal to be mined.  Some of these entries are "travelable," meaning that people may safely move through them to access the mine.  Mining equipment is installed directly adjacent to one of the walls of the block of coal, which wall, though it is in this instance one of the two of shorter width, becomes known as the "longwall face" and is the surface from which the coal is severed.

In addition to the shearer that severs the coal from the longwall face, the mining equipment also includes conveyor belts to transport the coal.  As the cutting head of the shearer moves back and forth across the longwall face, severed coal falls onto the first conveyor belt, which is positioned parallel to the face and transports the coal to a stage loader.  The stage loader in turn feeds the coal onto another conveyor belt system for removal from the mine.  The end of the longwall face towards which the first conveyor belt directs the severed coal for removal is called the "headgate," and entries on that side of the panel are "headgate entries."  The opposite end is called the "tailgate," and the entries there are "tailgate entries."

Longwall mining requires the use of hydraulic roof supports, or shields.  These shields support the roof over the area being mined, advancing with the longwall face as the coal is removed.  As the shields are moved, the unsupported roof material falls behind them to create what is called the "gob."  Though it has a nontechnical ring, the word "gob" is a term of art meaning "the space left by the extraction of a coal

4

seam into which waste is packed or the immediate roof caves." (Respondent's Brief at 8 n.6 (citing *Am. Geological Inst., Dictionary of Mining, Mineral and Related Terms* 239 (2d ed. 1997)).) In short, the term is used to describe the area behind the shields where coal has been extracted and the roof has been permitted to cave in. The gob is also sometimes referred to as the "worked-out area" or the "mined-out area."

Because methane gas, which is noxious and potentially explosive, is released during mining, a "bleeder system" or "bleeder ventilation system" is used to ventilate worked-out areas. "Bleeder entries" are integral to the bleeder system, serving as special air courses, or pathways, designed to remove methane from areas where mining has resulted in the extraction of a substantial portion of the coal.[1] The bleeder system dilutes methane coming from the gob with fresh air coming through the bleeder entries. The entries may be connected to one another by "crosscuts," which are small passageways usually driven at right angles to the entries. Air containing higher levels of methane exits the gob and enters the bleeder entries through connector entries that may contain

---

[1]More technically, the bleeder entries are defined as "[p]anel entries driven on a perimeter of a block of coal being mined and maintained as exhaust airways to remove methane promptly from the working faces to prevent buildup of high concentrations either at the face or in the main intake airways." (Respondent's Brief at 6 n.4 (citing *Am. Geological Inst., Dictionary of Mining, Mineral and Related Terms*, 55 (2d ed. 1997)).)

5

adjustable ventilation control devices. The points at which air from the gob goes into the bleeder entries can be used for measuring methane concentrations and hence are called "bleeder evaluation points," or "BEPs."

### 2. *Cumberland Mine*

Cumberland operates Cumberland Mine, a large underground coal mine in western Pennsylvania. The mine has the unfortunate distinction of being "gassy," which means that it typically liberates more than 1,000,000 cubic feet of methane in a twenty-four hour period and consequently requires spot inspection every five days by representatives of MSHA. 30 U.S.C. § 813(I). In a gassy longwall mine, methane is liberated from the longwall face that is being mined, as well as from within the gob. As previously noted, bleeder ventilation systems are intended to dilute and remove the liberated methane.[2]

This case involves ventilation problems associated with the forty-ninth longwall panel at Cumberland Mine, also

---

[2]Methane emanating from within the gob has to move some distance before it is diluted by the bleeder system. Areas close to the rubble, or fallen material in the gob, might contain high concentrations of methane, which, perhaps counterintuitively, makes for less hazard of an explosion. While Methane may be liberated from coal in concentrations at or near 100%, the explosive range of methane-air mixtures is from 5% to 15%.

known as the "No. 49 longwall panel" or "LW49." LW49 is 12,000 feet long by 1,250 feet wide and is the largest panel Cumberland has ever undertaken to mine. *Cumberland I*, 27 FMSHRC at 315.

Pursuant to 30 C.F.R. § 75.370(a)(1), a mine operator must submit a ventilation plan to MSHA for approval before beginning to mine. Section 75.370(a)(1) provides, in pertinent part:

> The operator shall develop and follow a ventilation plan approved by the district manager. The plan shall be designed to control methane and respirable dust and shall be suitable to the conditions and mining system at the mine ... .

The ventilation plan for LW49 was submitted to MSHA on November 7, 2003. The type of ventilation system proposed was a "wraparound" system that would circulate bleeder air by using fans already in place for other mining operations[3] to create a pressure differential that would draw air towards and across the longwall face. Cumberland chose the wraparound system over a more conventional "bleeder fan" system, which would have drawn air to a bleeder fan and shaft that was to have been installed at the back of the area that would become

---

[3]According to an employee of MSHA, the existing fans used to drive the wraparound bleeder system for LW49 were three and a half miles away from the panel. (App. at 257-58.)

the gob.[4]  Though Cumberland had originally planned to use a bleeder fan system at LW49 and had laid out the entries around the panel with that in mind, it abandoned those plans when it became clear that the bleeder fan could not be installed and operational by the time Cumberland wanted to begin mining.

No matter what system it had chosen, Cumberland knew it was obligated to comply with 30 C.F.R. § 75.334(b)(1), which sets forth a mandatory safety standard every ventilation system must meet:

> During pillar recovery a bleeder system shall be used to control the air passing through the area and to continuously dilute and move methane-air mixtures and other gases, dusts, and fumes from the worked-out area away from active workings and into a return air course or to the surface of the mine.

---

[4]The wraparound bleeder system brought the bleeder air inby, toward the working face, while traditional ventilation bleeder systems take the bleeder air outby, away from the longwall panel.  *See also Cumberland I*, 27 F.M.S.H.R.C. at 297 (explaining airflow of wraparound system).  "Inby" means "toward the working face, or interior, of the mine"; "outby" means "away from the face, ... toward the mine entrance." (Respondent's Brief at 7 n.5 (citing *Am. Geological Inst., Dictionary of Mining, Mineral and Related Terms*, 276, 383 (2d ed. 1997)).)

MSHA approved Cumberland's wraparound ventilation plan on December 9, 2003, but only for the first 8,000 feet of the panel.[5]  Mining of LW49 began on December 28, 2003.  From January 4 to 11, 2004, in what seems to have been an effort to deal with ventilation difficulties, Cumberland made three changes to the ventilation system without seeking prior approval from MSHA.[6]  On January 16, MSHA inspectors conducted a ventilation survey of LW49 and issued Citation No. 7083200, alleging a

---

[5]The letter from MSHA to Cumberland does not indicate what steps Cumberland or MSHA would take after the first 8,000 feet of mining was completed, though the ALJ noted that Cumberland anticipated the creation of another ventilation shaft that would enhance air circulation. *Cumberland I*, 27 FMSHRC at 297.  LW49 was 12,000 feet in length, an unusually large block of coal to ventilate with a wraparound system.  During the hearing before the ALJ, the Chairman of the Health and Safety Committee for Local Union No. 2300 testified that at Cumberland Mine, "the longest panel that they had utilizing the wraparound system was about 9,500 feet, but we have had other mines [on the same coal seam as the Cumberland Mine] where it's only maybe four or five thousand feet with a wraparound system where we have had serious ventilation problems." (App. 243, p. 140:4-10.)

[6]MSHA issued a citation for those unapproved changes to the mining plan.  That citation is not before us on appeal.

violation of section 75.334(b)(1).  The January 16 citation stated:

> The bleeder system for the active LW49 longwall section ... was determined to be ineffective in controlling the flow of air through the bleeder system to continuously dilute and move methane-air mixtures from the gob and away from the active workings ... .  Coal will not be mined with the longwall until ventilation changes are made to correct the bleeder system deficiencies and a plan submitted and approved by the District Manager showing the revised bleeder system.

(App. 90; 449-51.)

Several meetings then took place between Cumberland and MSHA personnel to discuss the ventilation changes necessary to cure the problem noted in the January 16 citation. MSHA required those changes because it "believed that the air flows measured in the ventilation surveys indicated that the BEPs on the tailgate did not provide accurate information on conditions in the #2 entry ... .  [MSHA] insisted that additional monitoring points be established at crosscuts #82 and #85." *Cumberland I*, 27 F.M.S.H.R.C. at 302.  After several meetings between MSHA and Cumberland, in response to MSHA's concerns, "Cumberland reluctantly submitted a proposed ventilation plan incorporating the changes required by MSHA." *Id.* at 303.  The revised plan provided, in pertinent part, that "[c]ontinuous monitoring will

10

take place in the [tailgate] at BEP30, BEP30A, BEP30B, 85xcut #2 to #1 entry ... . The monitoring will be on a 'roving' basis and the quality, quantity and airflow direction will be recorded ... ." *Id.* at 303-04. The revised ventilation plan was submitted to and approved by MSHA on January 21, 2004.

In addition to discussing with Cumberland the appropriate response to the January 16 citation, MSHA continued its mandatory spot inspections at the mine. On February 4, 2004, it issued Citation No. 7067000, alleging another violation of section 75.334(b)(1).[7] The February 4 citation focused on the monitoring points in the No. 2 entry that had been added pursuant to the revised ventilation plan. Specifically, the citation observed that

> [t]he bleeder system for the active LW49 longwall section ... was determined to be ineffective in controlling the flow of air through the bleeder system to continuously dilute and move methane-air mixtures from the gob away from the active workings. This was due to an adjustment to the ventilation controls in the No. 2 entry of the headgate side.

(App. 94-95; 454-59.)

_____

[7]An imminent danger order was also issued on February 4 but is not before us on appeal.

11

MSHA found yet another violation of section 75.334(b)(1) on February 7, 2004, after detecting "methane ... on the tailgate side, in the No. 2 entry, at the No. 85 crosscut at 5.0%." (App. 96.)  That violation formed the basis for Citation No. 7067003, which stated:

> The bleeder system for the active LW49 longwall section ... was determined to be ineffective in controlling the flow of air through the bleeder system to continuously dilute and move methane-air mixtures from the gob and away from the active workings.  This is a contributing factor to [an imminent danger order][8] ... .

(Appx. 96; 460-63.)  On February 13, 2004, Cumberland announced that it would idle LW49 until it could abandon the wraparound ventilation system and implement a bleeder fan ventilation system.  After Cumberland converted to the new system, the mine ceased having ventilation problems.

### B.      *Procedural Background*

This proceeding concerns the January 16, February 4, and February 7 citations. Cumberland contested them and, following a hearing, the ALJ issued a decision on March 28, 2005, upholding them.  *Cumberland I*, 27 F.M.S.H.R.C. at

---

[8]Again, this imminent danger order is not before us on appeal.

12

315, 327. Cumberland appealed that decision to the Commission. On August 29, 2006, the Commission issued a decision unanimously affirming the ALJ's finding that Cumberland had violated section 75.334(b)(1) on January 16, 2004. *Cumberland II*, 28 F.M.S.H.R.C. at 554. In an evenly split decision issued at the same time, the Commission also affirmed the ALJ's finding that Cumberland had violated the same regulation on February 4 and February 7, 2004.[9] *Id.* at 558.

## II. JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction to review a decision of the Commission under section 106(a)(1) of the Federal Mine Safety and Health Act of 1977 (the "Act"), 30 U.S.C. § 816(a)(1). The Commission had jurisdiction under sections 105(d) and 113(d) of the Act, 30 U.S.C. §§ 815(d) and 823(d).

We review *de novo* the legal conclusions of the ALJ and the Commission. *Utah Power & Light Co. v. Sec'y of Labor*, 951 F.2d 292, 293 n.1 (10th Cir. 1991)*; cf. Abdul-Akbar v. McKelvie*, 239 F.3d 307, 311 (3d Cir. 2001) ("This court reviews de novo issues of statutory interpretation ... .").

---

[9]The effect of a split decision is to allow the ALJ's decision to stand as if affirmed. *Cumberland II*, 28 F.M.S.H.R.C. at 558 (citing *Pennsylvania Elec. Co.*, 12 F.M.S.H.R.C. 1562, 1563-65 (1990), *aff'd on other grounds*, 969 F.2d 1501 (3d Cir. 1992)).

"The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. § 816(a)(1); *cf. Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) ("The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record."). "Substantial evidence ... means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 149 (1997) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

## III.    DISCUSSION

On appeal, Cumberland argues that the Commission and the ALJ erred by holding that compliance with a ventilation plan approved pursuant to section 75.730(a)(1) is not a defense to a violation of section 75.334(b)(1). Cumberland also asserts that its due process rights were violated because it did not have adequate notice of MSHA's interpretation of section 75.334(b)(1). Finally, Cumberland argues that the January 16, February 4, and February 7 citations are not supported by substantial evidence. We address each of these arguments in turn.

### A.    *Cumberland's Compliance with an Approved Ventilation Plan is Not a Defense to a Violation of Section 75.334(b)(1)*

Cumberland argues that the ALJ and the Commission erred in determining that section 75.334(b)(1) could be

14

violated even when a mine operator is complying with an approved ventilation plan. Cumberland's theory is that section 75.334(b)(1) imposes no duty on mine operators beyond compliance with a ventilation plan submitted pursuant to section 75.370(a). In other words, Cumberland asserts that compliance with section 75.370(a) constitutes an absolute defense to an alleged violation of section 75.334(b)(1). The Secretary responds that Cumberland's argument cannot be correct because it would render section 75.334(b)(1) superfluous.

The ALJ rejected Cumberland's position, following an earlier administrative decision in *Sec'y of Labor, Mine Safety & Health Admin. v. Plateau Mining Corp.*, 25 F.M.S.H.R.C. 738, 746 (2003), *aff'd*, 28 F.M.S.H.R.C. 501, 2006 FMSHRC LEXIS 152 (2006).[10] *Cumberland I*, 27 F.M.S.H.R.C. at 311. The ALJ stated that Cumberland's ventilation plan for LW49 may have represented its "best educated prediction" of how the panel could be ventilated in conformance with mandatory safety standards, but, despite MSHA's approval of the plan, "there was no guarantee that [the plan] would work effectively ... ." *Id.* The ALJ ultimately determined that, independent of the ventilation plan approval process, Cumberland was obligated to comply with section 75.334(b)(1) and could be charged with violating that

---

[10]The Commission's decision in *Plateau Mining* is currently under review in the United States Court of Appeals for the Tenth Circuit. *Sec'y of Labor, Mine Safety & Health Admin. v. Plateau Mining Corp.*, No. 06-9582 (10th Cir.).

regulation even while fully complying with the approved ventilation plan. *Id.* (citing *Utah Power & Light Co. v. Sec'y of Labor,* 12 F.M.S.H.R.C. 965, 969, *aff'd*, 951 F.2d 292 (10th Cir. 1991)).

The Commission unanimously affirmed the ALJ's decision in that regard. *Cumberland II*, 28 FMSHRC at 553. It agreed that "an operator cannot avoid a finding of violation of section 75.334(b)(1) by arguing that it was complying with the provisions of its ventilation plan." *Id.* The Commission characterized section 75.334 as containing "general provisions ... which set forth a level of safety required at all mines," and concluded that, because conditions in a mine may change unexpectedly, "compliance with specific ventilation plan provisions may not necessarily assure that the general protections afforded by ventilation regulations are being met." *Id.* at 553-54.

The ALJ here relied on the opinion expressed by another ALJ in the *Plateau Mining* case:

> [A] mine's approved ventilation plan represents the minimum specifications for ventilating the mine. A mine operator may violate section 75.334(b)(1) even though it is fully complying with the approved ventilation plan. First, the mine operator has better knowledge of the conditions that will be encountered when mining commences. More importantly, because an underground coal mine is a dynamic environment, a mine operator must be

16

> constantly vigilant when monitoring the
> conditions underground and it must make
> changes to its ventilation system as conditions
> warrant.

*Plateau Mining*, 25 FMSHRC 738, 759.  On review of the *Plateau Mining* decision, the Commission endorsed that reasoning, analogizing to another administrative decision, *Utah Power & Light*, 12 FMSHRC at 969, and stating:

> [We have] previously held that compliance with
> a mine's roof or dust control plan does not
> preclude a finding of violation of the underlying
> roof or dust control regulations [in *Utah Power
> & Light*] ... .  Similarly, an operator cannot
> avoid a finding of violation of section
> 75.344(b)(1) by arguing that it was complying
> with the provisions of its ventilation plan.
> Rather, an operator is required to comply with
> ventilation plan provisions, which encompass
> conditions specific to a mine, in addition to the
> more general requirements of section 75.334,
> which establish a general baseline which all
> mines must meet.  Conditions in a mine may
> change unexpectedly so that compliance with
> specific ventilation plan provisions may not
> necessarily assure that the general protections
> imposed by ventilation regulations are being
> met.  Thus, an operator is required to address its
> bleeder system if the bleeder system is not
> effectively controlling air through the worked-

17

> out area as required by section 75.334, even if the operator is complying with the terms of its ventilation plan.

2006 FMSHRC LEXIS 152 at *27-28; *see also id*. at *78 ("... [W]e do not agree with Plateau's position that complying with an approved ventilation plan is an absolute defense to a citation under section 75.334(b)(1) ... .").

During oral argument, Cumberland's counsel conceded that, were we to find the *Plateau Mining* case persuasive, Cumberland's argument that compliance with an approved ventilation plan constitutes a defense to a violation of section 75.334(b)(1) would fail. We do indeed find the reasoning in *Plateau Mining* persuasive, conclusively so, and we thus find the reasoning and analyses of the ALJ and the Commission in this case to be sound. Principles of statutory construction dictate that a regulatory scheme should be read as a whole, so that "effect is given to all its provisions ... ." *Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 31 (3d Cir. 1995) (citation omitted). Sections 75.730 and 75.334(b)(1) by their terms impose different responsibilities on mine operators – the former to prepare and submit a ventilation plan for approval, and the latter to ensure that methane is being effectively removed from the gob by a bleeder system. Following the Commission's decisions in *Plateau Mining* and *Utah Power & Light*, and considering the reasoning set forth in the record, we hold that the Commission did not err in affirming the ALJ's decision that compliance with an approved ventilation plan pursuant to section 75.370 is not a defense to a violation of section 75.334(b)(1).

18

### B. Cumberland Had Adequate Notice of MSHA's Interpretation of Section 75.334(b)(1)

Next, Cumberland contends that its right to due process was violated because, without first giving it fair notice, MSHA, acting for the Secretary of Labor, applied a novel interpretation of section 75.334(b)(1) in issuing citations related to the ventilation of LW49. More particularly, Cumberland alleges that the citations "were based solely on what amounts to "an unprecedented reliance on methane levels in the gob as a basis of the citations." (Petitioners Reply Brief at 1; *see also* Petitioner's Opening Brief at 23, 25.) Thus, according to Cumberland, its due process rights were violated because it could not have known that MSHA would use such data to evaluate the effectiveness of its ventilation system and as the basis for the issuance of citations. The Secretary, of course, contends that Cumberland was aware that the types of readings taken in the mine could be used in evaluating whether the ventilation system was operating in compliance with section 75.334(b)(1).

The ALJ specifically addressed Cumberland's due process argument and determined that Cumberland was on notice that the Secretary, through MSHA, had interpreted section 75.334(b)(1) as requiring Cumberland to maintain an adequate and effective ventilation bleeder system. *Cumberland I*, 27 F.M.S.H.R.C. at 312 (citing *RAG Cumberland Resources, LP v. Sec'y of Labor, Mine Safety & Health Admin.*, 23 F.M.S.H.R.C. 1241 (2001), *aff'd*, 26 F.M.S.H.R.C. 639, 647, 2004 FMSHRC LEXIS 96 (2004)). Looking first at the January 16 citation, the ALJ noted that,

though neither party had presented evidence of MSHA having considered in the past conditions comparable to those present at LW49, *Cumberland I*, 27 F.M.S.H.R.C. at 314, that was not unexpected because "[e]ach longwall panel is, in a sense, a unique undertaking." *Id.* at 315. Rather than focusing on whether the specific types of measurements at issue here had ever been used before, the ALJ approached the notice issue with the fundamental purpose of the regulation in mind: "[t]he overriding considerations on the fair notice question are the [mine] conditions' effect on safety under the circumstances presented by LW49." *Id.* On the evidence presented, the ALJ concluded "that a reasonably prudent person familiar with the mining industry and the protective purposes of the standard [embodied in section 75.334(b)(1)] would have recognized that the bleeder system was ineffective on January 16, 2004." *Id.*

As to the February 4 and 7 citations, the ALJ observed that Cumberland had submitted a revised ventilation plan to MSHA after MSHA issued the January 16 citation. MSHA had mandated changes to Cumberland's ventilation plan because it "believed that the air flows measured in the ventilation surveys indicated that the BEPs on the tailgate did not provide accurate information on conditions in the #2 entry. Consequently, [MSHA] insisted that additional monitoring points be established at crosscuts #82 and #85." *Cumberland I*, 27 F.M.S.H.R.C. at 302. After several meetings between MSHA and Cumberland, "Cumberland reluctantly submitted a proposed ventilation plan incorporating the changes required by MSHA," which was approved on January 21, 2004. *Id.* at 303. The revised plan

20

provided that "[c]ontinuous monitoring will take place in the [tailgate] at BEP30, BEP30A, BEP30B, 85xcut #2 to #1 entry ... . The monitoring will be on a 'roving' basis and the quality, quantity and airflow direction will be recorded ... ." *Id.* at 303-04. Based on these facts, the ALJ found that "Cumberland cannot reasonably assert that it could not have anticipated the possibility that data pertinent to LW49 bleeder system's performance, including conditions in the #2 entry, would not have been used to evaluate [the system's] effectiveness." *Id.* at 314.

All of the members of the Commission agreed with the ALJ's understanding of the notice provided by section 75.334(b)(1) and the commonsense application it has previously been given. Rejecting the argument that Cumberland lacked notice with respect to the January 16 violation, the Commission stated, "we recognize that section 75.334(b)(1) is broadly worded ... . ... [Nonetheless], [t]he appropriate test is not whether the operator had explicit prior notice of a specific prohibition or requirement, but whether a reasonably prudent person familiar with the mining industry and the protective purposes of the standard would have recognized the specific prohibition or requirement of the standard." *Cumberland II*, 28 F.M.S.H.R.C. at 554.

The Commissioners' unanimous agreement on that point thus makes particularly puzzling their parting of the ways with respect to the February 4 and 7 citations. The evenly split vote of the Commissioners meant that the the ALJ's decision with respect to those citations stood, *see supra* n. 9, but that outcome was not reached without a vigorous,

21

further discussion of the issue of notice.  Commissioners Young and Jordan[11] found that Cumberland's "lack of adequate notice" defense as to the February citations was untenable because Cumberland's January 21 ventilation plan "clearly designated numerous locations within the bleeder system, including the locations at issue here, as monitoring points where data was to be collected."  *Id.* at 561.  Commissioner Young wrote that, while Cumberland could have "refused to adopt what it...ha[s] characterized as an 'unprecedented' monitoring of the gob ... and then challenged the citation, it instead faxed to MSHA its revised ventilation plan including the provision it now challenges on notice grounds."  *Id.* at 562.  Therefore, Cumberland should have expected that MSHA would use the data collected at these points to evaluate the bleeder system.   In a compelling summary of the point, he said:

---

[11]Commissioner Jordan, who is no relation to the author of this opinion, concurred with Commissioner Young's analysis and conclusion affirming the portion of the ALJ's decision holding that Cumberland violated section 75.334(b)(1) on February 4 and 7.  *Cumberland II*, 28 F.M.S.H.R.C. at 571.  Commissioner Jordan wrote separately to dissent from the majority's decision to vacate the imminent danger orders issued on those dates, a decision which is not before us on appeal.  *Id.*  For ease of reference, we generally refer only to Commissioner Young when discussing the decision that reflects the conclusion of both Commissioner Young and Commissioner Jordan.

22

> If continuous effectiveness is, as we have held, a requirement for all bleeder systems, Cumberland cannot assert that it lacked notice when monitoring points established by MSHA to evaluate system effectiveness (with the operator's acceptance) were, in fact, used to determine whether the bleeder system was operating effectively.

*Id.* at 562.

Chairman Duffy and Commissioner Suboleski dissented, arguing "that Cumberland was not provided sufficient notice concerning what constituted a violation of [section 75.334(b)(1)] and how certain data would be used by MSHA for enforcement purposes" with respect to the February 4 and 7 citations. *Id.* at 564. The two dissenters felt that the ALJ failed to "fully comprehend the critical fact that the high methane readings on February 4 and 7 took place, not in a travelable bleeder entry or at a designated BEP, but in the gob – an area in which the presence of explosive methane mixtures was not unexpected or contrary to any regulation." *Id.* at 566. In response to Commissioner Young's observation that Cumberland submitted a revised ventilation plan including such monitoring of the gob at crosscut 85 in the No. 2 tailgate entry, the dissenting Commissioners said that, "[a]lthough the revised ventilation plan called for the pipes to be installed, the plan does not provide that a reading exceeding 4.5% at crosscut 85 indicates that the system is functioning ineffectively or that section 75.334(b)(1) has been violated." *Id.* at 566, n.2. They agreed with Cumberland that

23

MSHA took "the unprecedented approach of relying on methane readings in the gob" and did not provide adequate notice to Cumberland as to how it would interpret and apply section 75.334(b)(1) and the January 21 revised ventilation plan, or as to what criteria it would use in issuing citations.[12] *Id.* at 567.

Cumberland echoes the dissenters in arguing against the adequacy of the notice it received regarding the February citations, but Cumberland asserts that, even in issuing the January 16 citation, MSHA was applying a new and surprising interpretation of section 75.334(b)(1) by looking to methane and pressure readings from the gob as a basis for finding a violation of the regulation. According to Cumberland, "the plain language of the standard [set forth in section 75.334(b)(1)] imposes two requirements: 1) that

_____

[12]Specifically, the dissenters said that

Cumberland could not reasonably expect that MSHA would be taking the unprecedented approach of treating high methane readings in the gob itself as violating its regulations and that the new monitoring points would be used primarily as enforcement weapons ... . In short, when MSHA decided to issue citations for methane levels in the gob rather than at the bleeder entries and BEPs, Cumberland was entitled to notice of the change in the interpretation and application of the standard and the ventilation plan. We would vacate the February 4 and 7 citations for lack of notice.

*Cumberland II*, 28 FMSHRC at 569-70.

methane air mixtures shall be continuously diluted; and 2) that the methane-air mixtures shall be moved away from active workings for transport out of the mine." (Petitioner's Opening Brief at 22-23.) Cumberland recognizes that precedent from the Commission holds that "[s]ection 75.334(b)(1) contains an adequacy or effectiveness requirement with respect to the amount of methane dilution[,]" but Cumberland complains that nothing in the regulation addresses methane levels in the gob. (*Id.* at 27.)

We are not persuaded by Cumberland's argument or the reasoning of the dissenting Commissioners upon which it largely depends. As the Commission has persuasively said before in rejecting exactly the type of argument Cumberland makes here, "a regulation must be interpreted so as to harmonize and not to conflict with the objective of the statute it implements. ... Thus, ... a bleeder system must effectively ventilate the area within the bleeder system and protect active workings from the hazards of methane accumulations." *RAG Cumberland Resources,* 26 F.M.S.H.R.C. at 647, 2004 FMSHRC LEXIS 96. By its own admission, Cumberland knew that its responsibility was not simply to move methane around in the mine; it was to make the mine safe. As an experienced mine operator, Cumberland knew full well that there were significant problems with the wraparound bleeder ventilation system in place at LW49. The panel had not been designed for a wraparound system; no panel of that size had ever had a wraparound system; and problems with the LW49 wraparound system had been manifest from practically the first day of operations, problems so significant, in fact, that Cumberland was required to submit a revised plan to MSHA

25

after the January 16 inspection and citation. The ALJ aptly observed that Cumberland's due process defense cannot succeed since, "[t]aken to its logical conclusion, it would mean that an operator could continue mining in a longwall panel with an inadequate and ineffective bleeder system, because the specific type of data upon which MSHA relied to determine that the system was ineffective had not been previously used to evaluate such systems." *Cumberland I*, 27 F.M.S.H.R.C. at 314. We agree with the ALJ's conclusion that "[s]uch a result could not be more contrary to the legislative and regulatory scheme and is simply unacceptable." *Id.*

The monitoring was in accordance with Cumberland's plan and, subsequently, its revised plan. Measuring points in the No. 2 tailgate entry were added to the ventilation plan in response to the January 16 citation, so Cumberland had to know that MSHA was concerned about methane levels at those points and would be monitoring them.[13] Even if relevant,[14] Cumberland's argument that it did not know

---

[13]During oral argument, counsel for the Secretary stated that she was unaware of any situation where MSHA would require the installation of monitoring points for purposes other than monitoring. Counsel for Cumberland did not suggest any other purpose.

[14]Cumberland's arguments and the reasoning of the dissenting Commissioners can also be viewed as not truly aimed at the notice aspect of due process. Since everyone

26

MSHA would actually use the monitoring points for enforcement purposes is simply too severe a strain on credulity. Given the problems that developed with the wraparound system at LW49, MSHA's enforcement actions under section 75.334(b)(1) should not have been surprising to Cumberland and were in accordance with due process.

We do not suggest that MSHA could create and enforce rules divorced from a rational understanding of mine safety, which seems to be what Cumberland contends occurred here. The record, however, amply supports MSHA's concern, and Cumberland's acquiescence in the revisions to the plan undercuts any contention that enforcement based on the agreed upon monitoring was somehow an irrational

---

associated with the case agrees that the point of section 75.334(b)(1) is to require an effective system for the dilution and removal of methane, there seems no room to argue that enforcing that regulation by measuring methane movement in the vicinity of the mining activities at LW49 was somehow beyond the fair notice Cumberland had of MSHA's authority. What is really being argued is that the evidence being adduced to support MSHA's enforcement activities was not sufficient. The ALJ was correct in observing that "Cumberland's quarrel is, in reality, not so much with MSHA's consideration of data pertinent to conditions in the #2 entry, as it is with the reasonableness of the conclusion MSHA ultimately reached based upon that data." *Cumberland I*, 27 F.M.S.H.R.C. at 315.

government response to the problems encountered at the mine.

###### C. The January 16, February 4, and February 7 Citations are Supported by Substantial Evidence

Finally, Cumberland argues that the January 16, February 4, and February 7 citations are not supported by substantial evidence.  As the foregoing discussion indicates, we disagree.  The ALJ summarized the evidence that supported MSHA's conclusion that the ventilation system was not functioning properly on January 16.[15]  *Cumberland I*, 27

_____

[15]"The January 16 ventilation survey confirmed that neither BEP 30A, nor BEP 30, were providing reliable or useful information as to what was occurring in a substantial and important part of the LW49 bleeder system, the #2 entry, and the #3 entry and adjacent rubble zone....  There was virtually no air flow from the #3 tailgate entry into the #2 entry inby the #83 crosscut.  The pressure differential and air flow in the #2 entry and the adjacent #3 entry was outby from the #88 crosscut, and there were high methane concentrations in those areas.  While the methane that was actually in the #2 entry would be moved outby through BEP 30A into the bleeder entry, the flow in the #3 entry and the adjacent rubble zone would have been toward the face, because the overall pressure differential from the #87 to the #83 crosscut was in that direction.  The bleeder system was not moving methane in that substantial portion of the worked-out area away from the

F.M.S.H.R.C. at 314.  In affirming, the Commission noted that, "MSHA's survey results indicated that the methane-air mixture in the back corner on the tailgate side of LW49 was not emerging from the inby BEPs.  In essence, the back corner of the tailgate was dead airspace." *Cumberland II*, 28 F.M.S.H.R.C. at 554.  The Commission correctly concluded that there was substantial evidence to support the January 16 citation, since "a reasonably prudent person would have recognized that the bleeder system failed to continuously dilute and move the methane-air mixture from the worked-out area away from the active workings." *Id.*

Likewise, the ALJ found that LW49's "bleeder system was ineffective on February 4 and 7" and upheld the citations issued on those dates.  *Cumberland I*, 27 F.M.S.H.R.C. at 327.  Commissioner Young, supported by Commissioner Jordan, effectively affirmed[16] the holding that Cumberland had violated section 75.334(b)(1) on February 4 and 7, because, in his view, substantial evidence supported the ALJ's decision.[17]  *Cumberland II*, 28 F.M.S.H.R.C. at 558-59.

---

active workings."  *Cumberland I*, 27 FMSHRC at 314.

[16]See note 9, *supra*.

[17]Commissioner Young pointed to, *inter alia*, sudden increases in methane concentrations at or near the explosive range that were detected at the monitoring point at crosscut 85 in the No. 2 tailgate entry, sudden and significant methane increases detected at other monitoring points along the panel's

Though the dissenting Commissioners disagreed, *id.* at 564, we conclude that the ALJ and Commissioners Young and Jordan were correct in their assessment of the record. For example, the ALJ recounted the following evidence:

> On both dates, there was a sudden and substantial rise in methane concentrations, not just at the #85 crosscut monitoring point, but virtually throughout the tailgate side of the bleeder system.[18] Cumberland argues that [the MSHA inspector] issued the orders and citations solely because of the readings at the #85 crosscut monitoring point. While he testified to that effect, Cumberland reads too much into his responses to specific leading questions on cross-examination. I find that the better interpretation of his responses was that the crosscut #85 readings were the precipitating factors for issuance of the orders and citations. His testimony, as a whole, evidences that he was

---

tailgate side, and the testimony of MSHA's expert. *Cumberland II*, 28 F.M.S.H.R.C. at 559-60.

[18]The ALJ also noted that the inspector's "evaluations of the danger and the effectiveness of the bleeder system on February 4 and 7 were virtually the same, i.e., he was concerned that explosive levels of methane might be coming out onto the face where a number of ignition sources were present." *Cumberland I*, 27 F.M.S.H.R.C. at 325.

concerned as much about the sudden rise in methane readings within the system, and the absence of any immediate explanation for them, as he was about the crosscut #85 readings themselves. He also considered the unfolding events with an understanding that the bleeder system was fragile.

*Cumberland I*, 27 F.M.S.H.R.C. at 326.

The above-quoted portion of the ALJ's decision addresses imminent danger orders that are not before us on appeal, but it also pertains to the February 4 and 7 citations. Although the imminent danger orders were ultimately vacated, that does not mean that the facts found by the ALJ are irrelevant to the propriety of the February citations. On the contrary, though the standard for issuing a citation is different than that for issuing an imminent danger order, the facts are still the facts, and the facts here were sufficient to justify the issuance of the section 75.334(b)(1) citations on February 4 and 7, even if they could not support imminent danger orders.

## IV.    CONCLUSION

For the foregoing reasons, the Commission's August 29, 2006 decision affirming the ALJ's March 28, 2005 decision upholding the January 16, February 4, and February 7 citations is sound, and Cumberland's petition for review will be denied.

31