**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2191
_____

CONSOL PENNSYLVANIA COAL COMPANY, L.L.C.,
Petitioner

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION;
SECRETARY OF LABOR MINE SAFETY AND HEALTH ADMINISTRATION
_____

On Appeal from the Federal Mine Safety & Health Administration
(PENN 2021-0019)
Administrative Law Judge:  Honorable William B. Moran
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 10, 2023
_____

Before:  PHIPPS, MONTGOMERY-REEVES, and McKEE, *Circuit Judges*.

(Filed: September 14, 2023)
_____

OPINION[*]
_____

**PHIPPS**, *Circuit Judge*.

The Mine Safety and Health Administration issued two citations to Consol

Pennsylvania Coal Company in 2020 after six of its coal-carrying railcars broke free from

the brakeman car, hurtled down an inclined railroad, and crashed at the bottom of one of

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

its mines.  After exhausting the administrative process for challenging those citations, which each carried a civil penalty of $3,299.00, Consol timely petitioned this Court to set them aside.  *See* 30 U.S.C. § 816(a)(1).  In exercising exclusive jurisdiction over the petition, *see id.*, and reviewing the agency's factual findings for substantial evidence, *see id.*, and its legal conclusions *de novo*, *see Cumberland Coal Res., LP v. Fed. Mine Safety & Health Rev. Comm'n*, 515 F.3d 247, 252 (3d Cir. 2008), we will deny Consol's petition.

### FACTUAL BACKGROUND (FROM THE ADMINISTRATIVE RECORD)

Consol uses an inclined railroad to lower supplies and miners into Bailey Mine, an underground coal mine in Greene County, Pennsylvania, that Consol operates.  A hoist cable connected to the brakeman car controls the lowering of the railcars.  The brakeman car and all subsequent supply cars are attached through couplers, which are held in place by metal key stocks.  As a failsafe, adjacent cars are also connected to each other by two chains.  But a failure of both the coupler and the safety chains will enable adjacent cars to separate and accelerate down the incline railroad.

In 2011, such a runaway-train accident took place at Bailey Mine.  The first supply car separated from the brakeman car due to defects in the coupler and the safety chains.  As a result, that supply car and the five others attached to it careened 1700 feet down the track before colliding with the coal seam at the bottom of the mine.

MSHA, as the federal agency responsible for administering the Federal Mine Safety and Health Act of 1977, codified in relevant part at 30 U.S.C. §§ 801, 811–26, 861–78, *see* 29 U.S.C. § 557a, has the authority to issue Notices to Provide Safeguards directed at a specific transportation hazard in any individual mine, *see* 30 U.S.C. § 874(b) (authorizing the issuance of safeguards); 30 C.F.R. §§ 75.1403, 75.1403-1 to -11 (setting

out criteria to guide the issuance of safeguards). And after investigating the crash, the MSHA inspector issued two safeguards regarding the connection of cars on the inclined railroad at Bailey Mine: one for couplers, the other for safety chains. The safeguard for couplers required Consol to "properly maintain[]" and inspect all the cars' couplers. Safeguard 7070546 (JA267). The safeguard for chains required Consol to "properly maintain[]" the safety chains and their connection points on all cars in Bailey Mine and to examine each car before being hoisted in or out of the mine. Safeguard 7070545 (JA260).

Despite the safeguards, a decoupling accident again occurred on the slope into Bailey Mine on July 17, 2020. After railcars were inadvertently lowered too quickly, the automatic brake engaged, abruptly stopping the hoist and brakeman car. That rapid deceleration ripped off the supply car's coupler that connected it to the brakeman car. The two chains connecting the first supply car to the brakeman car were of uneven lengths, and they failed in succession. Fully detached from the brakeman car, the six supply cars carrying 94 tons of materials then barreled 1600 feet down the inclined track and crashed at the bottom. No one was injured in the accident, though there were miners working nearby.

The accident prompted a visit from an MSHA inspector. After completing his investigation, which included examining the wreckage and conducting interviews, he issued several citations. One of those was for violating the safeguard regarding couplers. Another was for violating the safeguard concerning safety chains. He designated both of those citations as Significant and Substantial, commonly abbreviated as 'S&S,' a classification which can carry additional consequences for a mine operator, such as

3

increased minimum fines.  *See Wolf Run Mining Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 659 F.3d 1197, 1198 (D.C. Cir. 2011); *see also* 30 U.S.C. §§ 814(d)(1), 820(a).

Consol challenged those two citations at a hearing before an Administrative Law Judge at the Federal Mine Safety and Health Review Commission.  *See* 30 U.S.C. § 823(d)(1).  After three days of testimony, the ALJ upheld each citation.  With respect to the coupler, the ALJ determined that it ripped out due to a missing key stock.  The ALJ also found that although neither chain was defective, their different lengths caused each to bear the full force of the supply cars in succession, rather than the two sharing that load equally at the same time.  The ALJ then concluded that Consol had violated the two safeguards by not properly maintaining and inspecting the coupler and the safety chains before using the incline.

Consol petitioned for discretionary review of that order, and the Federal Mine Safety and Health Review Commission denied that petition.  *See id.* § 823(d)(2)(A).  With that denial, the ALJ's decision became the final order of the Commission, *see id.* § 823(d)(1), and Consol timely filed a petition for review of that order in this Court, *see id.* § 816(a)(1).  Consol's petition challenges the validity of the safeguards, the legal and factual bases for the citations, and the S&S designations for the citations.

## DISCUSSION

### A.  Facial Validity of the Safeguards

Consol contends that the two safeguards are facially invalid.  The parties agree that to be valid, a safeguard must (i) identify the specific hazard at which it is directed and (ii) inform the mine operator of the conduct required to remedy that hazard.  S. Ohio Coal Co., 7 FMSHRC 509, 512 (1985).  Both safeguards meet those conditions.

4

Each safeguard identifies the specific hazard. Both safeguards describe the 2011 accident and forecast that runaway supply cars could seriously injure miners. One of the safeguards identifies the defective coupler as a cause of the runaway supply cars; the other safeguard identifies the faulty safety chains as another cause.

The safeguards also specify conduct for reducing the risk of the identified hazard. They direct Consol to properly maintain the couplers and safety chains, inspect the connections before any hoist trip, remove any defective cars from service immediately, and train its employees in proper inspection procedures. *See* Black Beauty Coal Co., 38 FMSHRC 1, 6 (2016) (recognizing that "identifying mine-specific examples of a problem, and then providing a more general solution," is "sufficiently specific to put an operator on notice as to the conduct required" and to sustain a safeguard's validity).

To portray the safeguard as impermissibly vague and broad, Consol quotes some generic-sounding phrases of the safeguards, such as their references to "defects" and "all rolling stock." But in context, those references are directed at deficiencies in the couplers and safety chains on the cars used at Bailey Mine, the types of deficiencies that caused the 2011 crash.

For these reasons, the safeguards satisfy the requirements for validity, and the ALJ did not err as a matter of law in concluding that MSHA legitimately exercised its authority in issuing those mine-specific orders.

## B. The Coupler Citation

Consol challenges the citation related to the coupler on two grounds. Neither succeeds.

First, as a matter of law, Consol argues that the safeguard does not cover a missing key stock. While the safeguard does not specifically mention a key stock, it does compel

Consol to "properly maintain[] couplers" on all cars in Bailey Mine. Safeguard 7070546 (JA267). And as multiple witnesses testified, the key stocks are necessary to keep the coupler mounted to the cars and are therefore essential components of any working coupler. Based on that evidence, the ALJ explained that "the key stocks aren't ornaments; they are an essential and integral part of the coupler arrangement." Consol Pa. Coal Co., 44 FMSHRC 300, 343 (2022) (opinion of Moran, ALJ) (JA49). And while key stocks are not permanently welded to the coupler, that alone is not dispositive. Much as a door missing a hinge would not be properly maintained, or as a hinge missing the screws fastening it to the door would not be properly maintained, a coupler missing a key stock is not properly maintained. Thus, the ALJ did not err as a matter of law in concluding that the safeguard regarding couplers requires couplers with key stocks.

Second, as a matter of fact, Consol contests the ALJ's finding that the key stock was missing prior to the accident. But substantial record evidence supports the ALJ's conclusion. Multiple witnesses testified, with photographs corroborating that testimony, that the supply car's coupler connection would have looked different had the key stock been ripped out by the force of the accident: the metal would have been shinier, evidencing a recently broken weld, yet it was brown and rusted. In addition, no key stock was recovered from the rubble of the accident, though Consol employees did look for one. One witness, Bailey Mine's safety supervisor, did give contrary testimony – contradicting the other witnesses and his own earlier testimony – that a key stock was found, but not kept. The ALJ did not ignore that testimony; he expressed skepticism of that account due to the witness's self-contradiction and due to his professed failure to preserve the key stock, given that he should have known such evidence would be vital to the case. In fact, as a penalty for that failure to preserve evidence, the ALJ made an

6

adverse inference that no key stock was found in the rubble. Still, the ALJ indicated that the ruling did not depend on that adverse inference since ample testimony supported the conclusion that the key stock was already missing without the inference. Thus, the ALJ's conclusion that the key stock was missing prior to the accident must be upheld: the ALJ accounted for detracting evidence and the record, considered as a whole, contains substantial evidence to support that conclusion. *See* 30 U.S.C. § 816(a)(1). *See generally Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## C. The Safety Chains Citation

Consol also disputes the ALJ's legal conclusion that the safety chains were not properly maintained. Consol contends that the safeguard for safety chains covers only the structural integrity of chains, not their lengths. But an examination of the safeguard's text, structure, purpose, and history reveals that it is not genuinely ambiguous and that its requirement of proper maintenance of the chains includes having chains of equal lengths. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (considering in the first instance the "text, structure, history, and purpose of a regulation").

The text and purpose of the safeguard strongly favor that interpretation. As written, the standard requires Consol to have "properly maintained safety chains and safety chain connection points" on all cars in Bailey Mine. Safeguard 7070545 (JA260). That text is not limited to chains but extends to their connection points, which reveals the importance of not only the chains but also how they are connected. Similarly, the purpose of having two chains is to bear the load together – as opposed to individually in succession – to keep the cars connected in the event of coupler failure. As a matter of mechanics, if the two chains were of different lengths, the shorter chain would bear the full load until it failed, and then the longer chain would bear the full load until it broke.

7

The purpose of requiring the proper maintenance of two chains to attach railcars would be defeated if the chains did not bear the load together.

The structure of the safeguard does little – one way or the other – to indicate whether it covers the safety chains' lengths. The safeguard consists of a two-page completed MSHA Form 7000-3, which includes blank spaces for background data, the mine condition or practice, and the justification for the action. From that structure, the safeguard does not provide a basis for inferring either that the safeguard covers only safety chains or that it applies to the use and maintenance of safety chains.

The history of the safeguard tilts in favor of Consol's interpretation. The safeguard was issued in response to the 2011 crash, which resulted from a structural defect in the chains' connections, not from the chains' unequal lengths.

But that historical context cannot overcome the combined effect of the safeguard's text, which extended beyond structural defects in chains, and its purpose, which was to prevent runaway cars due to a failure of the fallback safety chains. Moreover, the history did not create an ambiguity in the mind of the hoist operator at Bailey Mine, who said he would replace a chain of a different length. *See Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (considering a technical term's meaning to an "appropriately informed" speaker (internal quotation marks omitted)). Thus, as a matter of law, the ALJ correctly interpreted the safeguard to cover the length of safety chains such that chains of unequal lengths would not comply with the safeguard.

## D. The Significant and Substantial Designation

Finally, Consol challenges the ALJ's upholding of the S&S designation for the two citations. For a violation to be S&S, it must have contributed to a discrete safety hazard that would be reasonably likely to result in a serious injury. *See* Mathies Coal

8

Co., 6 FMSHRC 1, 3–4 (1984); *see also Sec'y of Lab. v. Consolidation Coal Co.*, 895 F.3d 113, 115 & n.1 (D.C. Cir. 2018) (applying without endorsing the *Mathies* test, when no party challenged its application). And here, the ALJ concluded that if a runaway train carrying 94 tons of supplies down 1600 feet of track with workers nearby is not reasonably likely to result in injury – and a likely fatal one at that – then the S&S designation would be meaningless. Consol argues that miners could take other safety measures to ensure that none of them were near the tracks when the cars were being lowered. But an S&S designation need not account for whether miners will protect themselves. *See Consolidation Coal Co.*, 895 F.3d at 118 ("[T]he hope or expectation that miners will protect themselves is not relevant under the *Mathies* test." (quoting Newtown Energy Inc., 38 FMSHRC 2033, 2044 (2016))); *see also* Eagle Nest, Inc., 14 FMSHRC 1119, 1123 (1992) (rejecting an ALJ's reasoning that the "exercise of caution" mitigates the hazard and vacating the ALJ's finding that a safeguard violation was not S&S). Thus, the ALJ's designation of the citations as S&S was supported by substantial evidence and was not contrary to law.

*     *     *

For the foregoing reasons, we will deny the petition.