# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 18, 2012      Decided December 28, 2012

No. 11-1306

BLACK BEAUTY COAL COMPANY,
PETITIONER

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
AND SECRETARY OF LABOR,
RESPONDENTS

———

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

———

*Ralph Henry Moore* argued the cause for the petitioner. *Patrick W. Dennison* was on brief.

*Cheryl C. Blair-Kijewski*, Attorney, United States Department of Labor, argued the cause for the respondent. *W. Christian Schumann*, Counsel, was on brief. *John T. Sullivan*, Attorney, Federal Mine Safety and Health Review Commission, entered an appearance.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Petitioner Black Beauty Coal Company (Black Beauty) petitions for review of an order of the Federal Mine Safety and Health Review Commission (FMSHRC) adopting the findings of its administrative law judge (ALJ) that: (1) Black Beauty violated 30 C.F.R. § 75.400, which prohibits the accumulation of coal and combustible materials in certain areas of a coal mine; (2) the violation was an unwarrantable failure to comply with [§ 75.400]; and (3) the violation constituted high negligence. For the reasons set forth below, we deny the petition.[1]

**I.**

Black Beauty operates the Air Quality No. 1 Mine (Mine), an underground bituminous coal mine located near Vincennes, Indiana. On February 26, 2009, Mine Safety and Health Administration (MSHA) inspector Danny Franklin (Franklin) entered the Mine to inspect its conveyor belts that are used to carry coal out of the Mine. Randy Hammond (Hammond), an inspector escort employed by Black Beauty,

---

[1] The respondents in this case are the Secretary of the United States Department of Labor and FMSHRC, an "adjudicative agency that is independent of the Department of Labor." Letter from John T. Sullivan, Attorney, FMSHRC to Mark J. Langer, Clerk, United States Court of Appeals for the District of Columbia Circuit, *Black Beauty Coal Co. v. FMSHRC*, No. 11-1306 (D.C. Cir. Apr. 13, 2012). The Secretary filed the respondent's brief and FMSHRC filed a letter stating that it responded to Black Beauty's petition by "stand[ing] on its decision issued in its adjudicative capacity." *Id.*

accompanied Franklin.[2] Shortly after entering the Mine, Franklin noticed the "distinct odor of coal burning" and asked three nearby miners about the smell. Transcript of ALJ Hr'g (Feb. 11, 2011) (Tr.) 80-81 (Joint Appendix (JA) 39A). One of the miners, Wayne Vogel (Vogel), told Franklin that he first noticed the smell approximately thirty minutes earlier. Vogel said he had investigated but had not found a cause so he did not report the burning smell to management.

Franklin then "follow[ed his] nose" and walked to a location where the "three main north" belt dumps coal onto the "one west B" belt. Tr. 83, 85, 159 (JA 40A, 59A). Black Beauty had installed a skirt rubber between the two belts to channel coal and prevent spills. Upon Franklin's arrival at the end of the one west B belt, also known as the "tail," Franklin found coal "packed in around th[e] tail roller" and trapped in the guards surrounding the roller. Tr. 83 (JA 40A). Franklin testified that the packed coal measured "two feet by five feet by 19 inches" and was "packed into a point to where the moving roller was—was turning in this compacted coal." Tr. 85-86 (JA 40A-41A). Franklin believed the coal was "already hot and burning as evidenced by the smell." Tr. 94 (JA 43A). Upon discovering the accumulation, Franklin asked Hammond "what was going to be done with this." Tr. 96-97 (JA 43A). When Hammond said that he would get someone to fix the problem, Franklin said: "[W]ait a minute, and I said I tell you what we're going to do, I'm going to issue an order and we're going to shut the belt off." Tr. 97 (JA 43A).

---

[2] Except where otherwise noted, the facts are from the testimony of Franklin and Hammond taken during the February 15, 2011 hearing before the ALJ.

Hammond disagreed, testifying that the coal was not burning. He believed that the burning smell came from the skirt rubber or the conveyor belt, both of which were made of fire-resistant rubber. He also testified that he did not see smoke or flames. Hammond also testified—as did Franklin— that neither their personal carbon monoxide detectors nor the Mine's carbon monoxide detectors indicated the presence of combustion. While Franklin testified that the carbon monoxide detectors activate at an "incipient" level of combustion, he also explained that the detectors work only if they are "in the right spot" and that he did not test the carbon monoxide detector at the one west B tail "belt drive." *See* Tr. 117, 119 (JA 48A-49A).

Hammond and Franklin also disagreed on how long the coal had been turning in the tail roller. Franklin's notes stated that the condition existed for approximately one hour but Hammond testified that the condition existed for only one minute or less before Franklin saw it and was caused by a sudden tear in the skirt rubber. Franklin did not dispute that the coal accumulation was caused by a tear in the skirt rubber or that such a condition *could* arise suddenly but believed the condition lasted for a longer time than Hammond estimated, primarily because Vogel told him the burning smell began at least thirty minutes before he arrived. Franklin and Hammond also disagreed on whether they saw coal spilling when they arrived at the belt; Hammond testified that he observed coal spilling when he and Franklin approached the one west B belt but Franklin testified that he did not see any spillage.

Franklin issued a citation at approximately 9:40 a.m. on the date of his inspection, concluding:

> Combustible material is allowed to accumulate
> around the 1 West "B" tail roller [in violation

of 30 C.F.R. § 75.400]. The accumulations are in the form of loose and fine coal measuring approximately 2 by 5 feet by 19 inches in width. The tail roller was touching and running in coal 17 inches wide by 2 feet tall and 4 feet in length. When inspected there was a distinctive odor indicating there was material getting hot.

With past history, the operator has engaged in aggravated conduct constituting more than ordinary negligence by continuing to violate this standard. This violation is an unwarrantable failure to comply with a mandatory standard.

JA 6A. Franklin also checked a box on the citation form indicating that Black Beauty's failure constituted "high negligence." JA 6A. On April 15, 2009, MSHA sent Black Beauty a proposed penalty assessment, which Black Beauty timely contested.

On February 15, 2011, the ALJ held a hearing on the Secretary's petition for assessment of civil penalty based on the above violation. *Black Beauty Coal Co.*, 33 FMSHRC 1482 (2011) (ALJ). At the hearing, Black Beauty relied on the testimony of James Villain (Villain), a belt shoveler who cleaned the one west B tail on the day of Franklin's inspection approximately twenty-to-twenty-five minutes before Franklin issued the citation. Villain testified that when he cleaned the tail, "there wasn't very much spillage and so I just took the water hose that was there and washed it down." Tr. 173 (JA 62A). Additionally, the skirt rubber was intact and the belt was working and was not spilling any coal. Villain then left the one west B tail and drove for approximately ten minutes

to the one west B head. When he arrived at the head, the belts there were shut down. Villain returned to the tail where he saw Franklin and Hammond, observed spilled coal and noticed the torn skirt rubber.

Crediting Franklin's testimony over that of Hammond and Villain, the ALJ found that the coal must have been "turning in the rollers for some time" because "the odor of burning coal had been evident for more than 30 minutes prior to the arrival of Hammond and Franklin." *Black Beauty Coal Co.*, 33 FMSHRC at 1487. The ALJ concluded that Black Beauty had violated section 75.400, which provides that "[c]oal dust, including float coal dust deposited on rock-dusted surfaces, loose coal, and other combustible materials, shall be cleaned up and not be permitted to accumulate in active workings, or on diesel-powered and electric equipment therein." 30 C.F.R. § 75.400. She rated the violation "significant and substantial" under 30 U.S.C. § 814(d) and also concluded that the violation was an unwarrantable failure to comply with section 75.400 and that the violation constituted high negligence.[3] *See Black Beauty Coal Co.*, 33

---

[3] If a mine operator is found to have engaged in "high negligence," it is subject to a larger fine. *See* 30 C.F.R. § 100.3(d), (g). Violations that are "significant and substantial" and constitute an "unwarrantable failure" may result in the issuance of withdrawal orders (requiring the immediate removal of miners from the affected area of the mine):

> If the violation is found to be both "significant and substantial" and "caused by an unwarrantable failure of [the] operator to comply with [the] mandatory health or safety standards," section 104(d)(1) requires a withdrawal order for a second mandatory standard violation caused by an "unwarrantable failure to comply" within 90 days of the

FMSHRC at 1485-88. Accordingly, the ALJ assessed a $70,000 civil penalty. *Id.* at 1488. Black Beauty timely petitioned for review.

## II.

Black Beauty challenges the ALJ's determination that Black Beauty violated section 75.400, that the violation was an unwarrantable failure, *see* 30 U.S.C. § 814(d)(1), and that the violation constituted "high negligence," *see* 30 C.F.R. § 100.3(d). We review the ALJ's findings of fact for

first. 30 U.S.C. § 814(d)(1). Section 104(d)(2) requires a second withdrawal order for "violations similar to those that resulted in the issuance of the [first] withdrawal order." *Id.* § 814(d)(2). Section 104(e)(1) requires withdrawal for "any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard" within 90 days after the operator has been notified of "a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards." *Id.* § 814(e)(1). Once a section 104(e)(1) withdrawal order issues, section 104(e)(2) requires another such order for "any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine health or safety hazard." *Id.* § 814(e)(2).

*Cyprus Emerald Res. Corp. v. Fed. Mine Safety & Health Review Comm'n*, 195 F.3d 42, 43 n.1 (D.C. Cir. 1999) (alterations in original).

substantial evidence and review questions of law *de novo*. 30 U.S.C. § 816(a)(1); *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1099 (D.C. Cir. 1998).

## A.

30 C.F.R. § 75.400 provides:

> Coal dust, including float coal dust deposited on rock-dusted surfaces, loose coal, and other combustible materials, shall be cleaned up and not be permitted to accumulate in active workings,[4] or on diesel-powered and electric equipment therein.

Section 75.400 prohibits accumulations but not mere spillages. *See Old Ben Coal Co.* (*Old Ben II*), 2 FMSHRC 2806, 2808 (1980). No bright line differentiates the two terms. *See* C. Gregory Ruffennach, *Free Markets, Individual Liberties And Safe Coal Mines: A Post-Sago Perspective*, 111 W. Va. L. Rev. 75, 89 (2008). An accumulation exists if "a reasonably prudent person, familiar with the mining industry and the protective purpose of the standard, would have recognized the hazardous condition that the regulation seeks to prevent." *Utah Power & Light Co.*, 12 FMSHRC 965, 968 (1990), *aff'd*, *Utah Power & Light Co. v. Sec'y of Labor*, 951 F.2d 292 (10th Cir. 1991); *see also Old Ben II*, 2 FMSHRC at 2808 ("[T]hose masses of combustible materials which could cause or propagate a fire or explosion are what Congress intended to proscribe.")

---

[4] "[A]ctive workings" is defined as "[a]ny place in a coal mine where miners are normally required to work or travel." 30 C.F.R. § 75.2.

Black Beauty argues that it did not violate section 75.400 because the coal turning in the tail roller was the result of a sudden spill that occurred only briefly before Franklin observed it. Because Black Beauty did not have a reasonable amount of time to clean up the coal before Franklin issued the citation, it argues that the coal did not accumulate within the meaning of section 75.400. We disagree. FMSHRC has expressly rejected the argument that "accumulations of combustible materials may be tolerated for a 'reasonable time.'" *Old Ben Coal Co.* (*Old Ben I*), 1 FMSHRC 1954, 1957-58 (1979)[5]; *see also Utah Power*, 12 FMSHRC at 968 (section 75.400 "'was directed at preventing accumulations in the first instance, not at cleaning up the materials within a reasonable period of time after they have accumulated'") (quoting *Old Ben I*, 1 FMSHRC at 1957).[6]

---

[5] *Old Ben* interpreted 30 U.S.C. § 864(a), a provision almost identical to 30 C.F.R. § 75.400. Section 864(a) was an interim safety standard in effect before the current regulation was promulgated. *See* 30 U.S.C. § 861(a).

[6] Black Beauty relies on a footnote in *Utah Power & Light Co. v. Sec'y of Labor*, 951 F.2d 292 (10th Cir. 1991), containing the following dicta: "While everyone knows that loose coal is generated by mining in a coal mine, the regulation plainly prohibits permitting it to accumulate; hence it must be cleaned up with reasonable promptness, with all convenient speed." *Id.* at 295 n.11. While some FMSHRC ALJ decisions have relied on the dicta to find that section 75.400 can be violated only after a reasonable time, "[a] decision of a[n ALJ] is not a precedent binding upon the [FMSHRC]." 29 C.F.R. § 2700.69(d). FMSHRC has not followed the Tenth Circuit's twenty-year-old dicta nor has any court, including the Tenth Circuit.

Moreover, the ALJ found that coal had been turning in the tail roller for a significant period. Black Beauty makes several arguments contesting this finding. First, it contends that the record establishes that the coal spilled because the skirt rubber tore, the tear occurred just minutes before Franklin saw it and the spill occurred almost immediately after the tear. It notes that Franklin testified, in response to Hammond's statement that the accumulation was caused by the skirt rubber tear: "I thought that that was very reasonable. I didn't doubt what he was saying. I was pleased to hear that he had found the root cause." Tr. 91 (JA 42A); *see also* Tr. 101 (JA 44A) (Franklin: "I think that it was a result from coal spilling"). Franklin also conceded that coal could "gob up" in the tail roller in as little as "30 seconds to—to a couple minutes." Tr. 90 (JA 42A). Black Beauty also notes that Hammond believed the coal had accumulated for "a minute or less" because he saw coal spilling at the time he arrived at the tail and also observed wet coal on the ground. Tr. 162-63 (JA 60A). Hammond also testified that the skirt rubber could tear "in an instant." Tr. 162 (JA 60A).

After considering these facts, however, the ALJ explained that none of the evidence explained the smell of burning coal that occurred at least thirty minutes before Franklin's arrival. *Black Beauty Coal Co.*, 33 FMSHRC at 1487. Accordingly, the ALJ found "that Franklin presented a scenario that was the most likely and well grounded in fact." *Id.* at 1488; *see also Keystone Coal Mining Corp.*, 151 F.3d at 1107 (ALJ's "determinations of credibility are entitled to great deference").

Black Beauty argues before us that Franklin's testimony was inconsistent with Villain's testimony that he (Villain) had not noticed "very much spillage" when he "hosed . . . off" the tail just minutes before Franklin arrived. Tr. 173 (JA 62A).

Black Beauty maintains that the ALJ erroneously credited Franklin's testimony over Villain's because Franklin's testimony, relying as it did on Vogel's statements, was hearsay. But testimony based in part upon hearsay can be credited over other testimony. *See generally Hoska v. U.S. Dep't of the Arm*y, 677 F.2d 131, 138-39 (D.C. Cir. 1982) ("[U]nder certain circumstances, hearsay can constitute substantial evidence[,]" such as "where declarants are disinterested witnesses"); *cf. Windsor Coal Co.*, 21 FMSHRC 997, 1002 (1999) ("[T]he Commission has permitted duration to be established through the use of circumstantial evidence."). Moreover, the ALJ rejected Villain's testimony because he did not testify as to the existence *vel non* of a burning odor[7] nor did he testify whether there was coal accumulated in the tail roller guard or turning in the roller. *See Black Beauty Coal Co.*, 33 FMSHRC at 1487-88.

Black Beauty also argues that the ALJ's duration finding was unsupported by substantial evidence because the burning smell Franklin described was unaccompanied by combustion. Neither smoke nor flames accompanied the smell and neither Franklin's nor Hammond's carbon monoxide detectors (which activate at an incipient level of combustion) emitted any warning. But Franklin did not testify to the contrary; he further explained that the carbon monoxide detectors worked only if they were "in the right spot" and that he did not test the carbon monoxide detector at the belt drive. Tr. 119 (JA 49A). The lack of smoke, flames or a carbon monoxide monitor warning does not mean that the ALJ's duration finding was unsupported by substantial evidence.

---

[7] Although Black Beauty claims that Villain testified that there was "no smell . . . ten minutes before," Reply Br. 4, Villain did not testify one way or another regarding a smell.

In sum, the ALJ's conclusion that Black Beauty violated section 75.400 is supported by substantial evidence.

**B.**

The ALJ also concluded that Black Beauty's violation of section 75.400 constituted an unwarrantable failure. *See* 30 U.S.C. § 814(d)(1).

> The Commission has defined "unwarrantable failure" as "aggravated conduct, constituting more than ordinary negligence, by a mine operator in relation to a violation of the Act." *Emery Mining Corp. v. Secretary of Labor, MSHA*, 9 F.M.S.H.R.C. 1997, 2004 (1987). It is characterized by "indifference," "serious lack of reasonable care," "reckless disregard," or "intentional misconduct." *Cyprus Plateau Mining Corp. v. Secretary of Labor, MSHA*, 16 F.M.S.H.R.C. 1610, 1615 (1994) (citations omitted). If an operator reasonably, but erroneously, believes in good faith that the cited conduct is the safest method of compliance with the applicable regulations, its actions will not constitute aggravated conduct that exceeds ordinary negligence. *Id.*

*Jim Walter Res., Inc. v. Sec'y of Labor*, 103 F.3d 1020, 1025 (D.C. Cir. 1997).

FMSHRC uses several factors to determine whether an unwarrantable failure sanction is appropriate. The factors include "the length of time that the violation has existed, the extent of the violative condition, whether the operator has been placed on notice that greater efforts were necessary for compliance, the operator's efforts in abating the violative

condition, whether the violation was obvious or posed a high degree of danger, and the operator's knowledge of the existence of the violation." *IO Coal Co.*, 31 FMSHRC 1346, 1350-51 (2009). "While an administrative law judge may determine, in his discretion, that some factors are not relevant, or may determine that some factors are much less important than other factors under the circumstances, all of the factors must be taken into consideration and at least noted by the judge." *Id.* at 1351.

The ALJ discussed the relevant factors and found several supported by substantial evidence *See Black Beauty Coal Co.*, 33 FMSHRC at 1484. As we noted earlier, substantial evidence supports the ALJ's finding that the violation existed for a significant period. Second, substantial evidence also supports the ALJ's finding that Black Beauty did not take sufficient action to abate the violation. She stated that "[i]t is clear . . . that the mine has failed to train its miners" based on the fact that miner Vogel failed "to call or seek help when [he could not] discover the source of a burning smell" and because "[t]his mine [ ] had a number of prior violations for accumulations, along with prior warnings for excessive accumulations on the belt line." *Id.* at 1488. In fact, Black Beauty received 102 citations and orders for accumulations violations for the Mine less than one year before this citation, 234 citations and orders for accumulations violations in the previous two years and Franklin issued citations for three other nearby accumulations at the Mine on *the same day*. *Id.* at 1483, 1488.

Black Beauty claims that the ALJ's lack-of-training finding is insufficient because there was no record evidence of its miners' training. But FMSHRC has in the past relied on circumstantial evidence to find inadequate training. *Rock of Ages Corp.*, 20 FMSHRC 106, 122-23 (1998) ("[T]he judge

relied on the 26 percent misfire rate of pyrodex, and foreman Kelty's failure to engage in a further search for additional misfires after Batchelder's discovery of the four bags, as strong circumstantial evidence of inadequate training . . . ."). Moreover, as the ALJ discussed, Black Beauty presented no evidence to refute Franklin's opinion that the "little had been done to address accumulations on the belt at this mine." *Black Beauty Coal Co.*, 33 FMSHRC at 1488.

Black Beauty further asserts that past violations cannot be used to support an unwarrantable failure finding unless they are similar to the cited violation. As FMSHRC has explained, however, "[r]epeated similar violations may be relevant to an unwarrantable failure determination to the extent that they serve to put an operator on notice that greater efforts are necessary for compliance with a standard." *San Juan Coal Co.*, 29 FMSHRC 125, 131 (2007). And it "has rejected the argument that only past violations involving the same regulation and occurring in the same area within a continuing time frame may properly be considered when determining whether a violation is unwarrantable." *Id.* Instead, "even if a different area was cited, past violations may, nonetheless, provide an operator with sufficient awareness of an accumulation problem." *Id* (footnote omitted). The ALJ used Black Beauty's past violations of section 75.400, *including warnings for excessive accumulations on the belt line*, *Black Beauty Coal Co.*, 33 FMSHRC at 1488, to conclude that its violation constituted an unwarrantable failure pursuant to 30 U.S.C. § 814(d)(1).

## C.

Finally, Black Beauty contends that the ALJ's high negligence finding was unsupported by substantial evidence. High negligence exists if "[t]he operator knew or should have

known of the violative condition or practice, and there are no mitigating circumstances." 30 C.F.R. § 100.3(d) Table X. Mitigating circumstances include, but are not limited to, "actions taken by the operator to prevent or correct hazardous conditions or practices." *Id.* § 100.3(d). Black Beauty does not detail any mitigating circumstances, leaving as the only question whether Black Beauty "knew or should have known of the violative condition or practice." *Id.* & Table X.

The ALJ's high negligence finding appears to be based on four facts: (1) Black Beauty had been cited for several past accumulations violations (including warnings for belt line accumulations); (2) the burning smell existed for a significant time period; (3) Villain "should have . . . seen and noted" the coal turning in the tail roller; and (4) Vogel and the other miners did not alert management after noticing a burning smell. *See Black Beauty Coal Co.*, 33 FMSHRC at 1487–88. Black Beauty makes the same argument here that it made to contest the ALJ's unwarrantable failure finding. And we reject the argument for the same reasons we rejected it in connection with the unwarrantable failure sanction.

For the foregoing reasons, Black Beauty's petition for review is denied.

*So ordered.*