# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 14, 2015          Decided January 12, 2016

No. 14-1266

MACH MINING, LLC,
PETITIONER

v.

SECRETARY OF LABOR, ET AL.,
RESPONDENTS

On Petition for Review of a Decision of the
Federal Mine Safety & Health Review Commission

*James P. McHugh* argued the cause for petitioner. On the brief was *Christopher D. Pence*.

*Cheryl C. Blair-Kijewski*, Attorney, U.S. Department of Labor, argued the cause for respondents. With her on the brief was *W. Christian Schumann*, Counsel. *John T. Sullivan*, Attorney, entered an appearance.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Mach Mining ("Mach") petitions for review of the final order of the Federal Mine Safety and Health Review Commission concluding that two of Mach's

regulatory violations under the Mine Safety and Health Act were the result of "high negligence" and one violation was also "significant and substantial." Mach contends these determinations were unwarranted in view of its efforts to mitigate the violations and the limited danger they posed. Because the factual findings underlying these determinations are supported by substantial evidence, we deny the petition.

**I.**

The Federal Mine Safety and Health Act of 1977 was enacted giving "the first priority and concern" to the "health and safety of its most precious resource — the miner," in view of "an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm." 30 U.S.C. §§ 801(a), (c). To carry out this purpose, Congress directed the Secretaries of Health and Human Services and Labor to develop permanent mandatory health or safety standards. *Id.* § 801(g). Inspectors from the Mine Safety and Health Administration ("MSHA") in the Department of Labor regularly inspect mines to ensure compliance with mandatory health or safety regulations. *Id.* § 813. Upon discovering a mine operator is not in compliance with these standards, the inspector must issue a written citation. *Id.* § 814(a). The Secretary of Labor is authorized to enforce the mandatory standards through civil penalties, *see id.* §§ 815, 820, upon considering, among other things, the operator's history of previous violations and whether the operator was negligent, *id.* § 815(b)(1)(B). In more serious cases, the Secretary must issue a withdrawal order, bringing mine operations to a halt until the violation is abated. *See id.* § 814(d), (e), (h). When the Secretary pursues enforcement measures or seeks civil penalties, *see id.* §§ 814, 815, 820, the mine operator has the opportunity for an administrative hearing and appeal to the Commission,

followed by judicial review, *id.* §§ 815, 816.

Mach operates a longwall coal mine in Johnston City, Illinois that releases more than 1 million cubic feet of methane daily. The Secretary of Labor proposed civil penalties for a series of citations that had been issued at the mine. Two citations are at issue here.

On October 30, 2008, Mach received a citation for violating 30 C.F.R. § 75.400, which provides that "[c]oal dust, including float coal dust deposited on rock-dusted surfaces, loose coal, and other combustible materials, shall be cleaned up and not be permitted to accumulate in active workings." Inspector Edward Law issued the citation based on coal that had accumulated around two conveyor belts — a temporary belt and the main belt carrying mined coal out of the mine. Due to the extensive accumulations, the temporary belt was "actually sitting on top of the coal." Hr'g Tr. 113 (testimony of Inspector Law) (Aug. 2, 2011). To address the situation, Mach shut down the main belt (and thereby also the temporary belt) at 2:30 a.m. on October 30, and both belts remained off when Inspector Law observed the area later that morning. Inspector Law nonetheless concluded that the accumulations violation was the result of high negligence and was "significant and substantial."

On November 17, 2008, Mach received a citation for violating 30 C.F.R. § 75.380(f)(3)(iii), which prohibits mine operators from locating "battery charging stations" in primary escapeways. Inspector Dean Cripps found a charging station parked in the primary escapeway. He had cited Mach for the same violation on October 28; that citation was terminated on November 7, when another inspector observed that the charging station was locked so it could not be used unless the lock was removed. Although the charging station was locked when Inspector Cripps saw it on November 17, he nonetheless issued

the citation because he would not have terminated the prior citation based merely on it being locked and he was convinced the station had been unlocked at times between November 7 and November 17. While Inspector Cripps was investigating the charging station, a mine foreman approached to see if his equipment had been charged, explaining that this was where he normally charged his equipment. Inspector Cripps concluded the November 17 violation was a result of Mach's high negligence.

The Secretary of Labor notified Mach of proposed assessments totaling $4,800 in civil penalties for the two regulatory violations. *See* 30 U.S.C. § 815. Mach admitted the violations but disputed whether either citation warranted a finding of high negligence and whether the coal accumulations violation was "significant and substantial." After a hearing, the ALJ concluded the requested penalties were appropriate. *Mach Mining, LLC*, 36 FMSHRC 2533, 2547 (2014). Mach petitions for review of the ALJ's decision, which became a final decision 40 days after the Commission denied Mach's request for review. *See* 30 U.S.C. §§ 816(a)(1), 823(d).

## II.

Mach's challenges to the ALJ's "high negligence" and "significant and substantial" determinations rest on its view that its mitigating efforts should as a matter of fact and law have reduced the level of negligence and eliminated the "significant and substantial" determination. The ALJ's factual findings underlying these determinations are subject to review for substantial evidence, which requires the court to "determine whether there is such relevant evidence as a reasonable mind might accept as adequate to support the judge's conclusion." *Jim Walter Res., Inc. v. Sec'y of Labor*, 103 F.3d 1020, 1023–24 (D.C. Cir. 1997) (quoting *Chaney Creek Coal Corp. v. Fed.*

*Mine Safety & Health Review Comm'n*, 866 F.2d 1424, 1431 (D.C. Cir. 1989)). Questions of law are subject to *de novo* review, 30 U.S.C. § 816(a)(1); *see Black Beauty Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 703 F.3d 553, 558 (D.C. Cir. 2012).

**A.**

In assessing civil penalties under the Mine Act for violating mandatory health and safety regulations, the Commission is required to "consider . . . whether the operator was negligent, . . . the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation." 30 U.S.C. § 820(i). The parties' briefs indicate that the proper framework for determining negligence — and whether that negligence was high, moderate, or low — is found in 30 C.F.R. § 100.3(d). This provision defines negligence as "conduct, either by commission or omission, which falls below a standard of care established under the Mine Act to protect miners against the risks of harm." *Id.* Mitigating circumstances can alter the level of negligence, and "may include, but are not limited to, actions taken by the operator to prevent or correct hazardous conditions or practices." *Id.* In a formulaic mode, the level negligence is high, moderate, or low if the operator "knew or should have known of the violative condition or practice" and there are no, some, or considerable "mitigating circumstances," respectively. *Id.*

Mach contends that a finding of a mitigating circumstance is incompatible with high negligence under section 100.3(d) and that its efforts to address the violations should have been considered mitigating in nature. For the accumulations violation, Mach maintains that its negligence was mitigated by the efforts on October 29 to clean up the accumulations and by its examiner's decision, in compliance with 30 C.F.R.

§ 75.363(a), to remove the main belt from service once he discovered the accumulations on the day of the citation. Mach notes that Inspector Law agreed that removing the belt from service was what he expected an operator's examiner to do in these circumstances. For the charging station violation, Mach maintains that it was not highly negligent because it had locked the charging station by the time the inspector issued the citation.

Mach presumes, incorrectly, that evidence of a mitigating circumstance precludes the Commission and its ALJs from finding a regulatory violation resulted from the high negligence of the mine operator. Section 100.3(d) does adopt a formulaic approach suggesting high negligence is incompatible with the existence of mitigating circumstances. But the Commission is not bound by the MSHA regulation and has held, *see Sellersburg Stone Co.*, 5 FMSHRC 287, 291–92 (1983); *Shamrock Coal Co.*, 1 FMSHRC 469, 469 (1979), and recently reaffirmed, that the regulation applies "only to the *proposal* of penalties by MSHA and the Secretary of Labor," *Brody Mining, LLC*, 37 FMSHRC 1687, 1701 (2015); *Jim Walter Res., Inc.*, 36 FMSHRC 1972, 1975 n.4 (2014). "[U]nder both Commission and court precedent, the regulations do not extend to the independent Commission, and thus the MSHA regulations are not binding in any way in Commission proceedings." *Brody Mining*, 36 FMSHRC at 1701 (citing *Jim Walter Res.*, 36 FMSHRC at 1975 n.4, and *Sellersburg Stone Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 736 F.2d 1147, 1151–52 (7th Cir. 1984)). This differential approach to negligence was contemplated in the relevant rulemaking, *see Criteria and Procedures for Proposed Assessment of Civil Penalties*, 47 Fed. Reg. 22,286, 22,287 (May 21, 1982), and a "split-function" approach accords with the Mine Act, which "reflects Congress's concern that the adjudicatory function be institutionally independent of potential influence by the agency responsible for policymaking and enforcement decisions." *Prairie State*

*Generating Co. v. Sec'y of Labor*, 792 F.3d 82, 86 (D.C. Cir. 2015).

Instead of using the negligence standards in section 100.3(d), the Commission "may evaluate negligence from the starting point of a traditional negligence analysis." *Brody Mining*, 37 FMSHRC at 1702. This analysis asks whether an operator has met "the requisite standard of care — a standard of care that is high under the Mine Act." *Id.* Considerations include "what actions would have been taken under the same circumstances by a reasonably prudent person familiar with the mining industry, the relevant facts, and the protective purpose of the regulations." *Id.* The Commission has explained as well that an ALJ "is not limited to an evaluation of allegedly 'mitigating' circumstances" and should consider the "totality of the circumstances holistically." *Id.* For that reason, an ALJ "may find 'high negligence' in spite of mitigating circumstances or may find 'moderate' negligence without identifying mitigating circumstances." *Id.* at 1702–03. In the Commission's view, the real "gravamen of high negligence is that it 'suggests an aggravated lack of care that is more than ordinary negligence.'" *Id.* at 1703 (quoting *Topper Coal Co.*, 20 FMSHRC 344, 350 (1998)).

Although the ALJ's analysis appeared to follow this more holistic approach — explaining that "mitigating circumstances" may be considered by MSHA and considering all the circumstances surrounding the two regulatory violations, including Mach's compliance efforts, before concluding that a high negligence determination was required for both violations — the ALJ cited the negligence standards of section 100.3(d). *See Mach Mining*, 36 FMSHRC at 2536, 2542–43, 2545–46. We need not decide which standard the ALJ applied because the analysis adopted by the ALJ is supported by substantial evidence even under the more formalistic requirement of section

100.3(d) that there be no mitigating circumstances.

*Accumulations*. The ALJ concluded that Mach failed to take the steps required to prevent what had become a common accumulations problem or to remove the accumulations promptly upon discovery. Mach's examiner and mine manager both testified that spillage occurred "pretty often" because the chute designed to transfer the coal to the middle of the main belt could easily get blocked. The ALJ found that Mach was "on notice that accumulations were likely to arise at this transfer point *and* knew about the actual violative conditions in question." *Mach Mining*, 36 FMSHRC at 2543. Yet, as the record shows, Mach did not start cleaning up the accumulations until after the citation was issued. Mach attempts to justify the delay, explaining that the 3:30 a.m. roof fall was a priority and that at 7:15 a.m. MSHA ordered evacuation of the area near the roof fall (which included the area with the coal accumulations). This does not explain why Mach had not cleaned up the accumulations in the hours between the initial afternoon discovery of the accumulations and the roof fall.

Mach emphasizes that even though it had not rectified the accumulations problem, it had taken corrective measures to mitigate it. It claims that it had cleaned up the accumulations on October 29 and turned off the main belt. The record supports the ALJ's finding that Mach had not cleaned up the accumulations on October 29, despite having time to do so. Although Mach's log book included an entry that accumulations were present on the afternoon prior to issuance of the October 30 citation, the inspector saw no notation that the accumulations had been cleaned up. Lack of a corrective notation was not dispositive because at the time the citation was issued there was still time for Mach to record corrective actions made the day before. But no record evidence required the ALJ to find such a clean up had occurred.

Mach's only evidence on this point is testimony by one of its examiners that at 9:30 p.m. on October 29, he saw the belts were running and the "tail rotor was clear," thus suggesting that the spill found on October 30 was recent. The ALJ concluded the examiner's testimony deserved no weight because he had not been making a full belt examination and gave no reason to believe his "observation of the belt tail area was at all rigorous." *Mach Mining*, 36 FMSHRC at 2539. Instead, the ALJ credited Inspector Law's opinion that there had been no clean up. Inspector Law acknowledged that he had "no way of knowing" whether the accumulations had been cleaned up, but if they had, he pointed out, then "the spill that [Mach] had ongoing was creating a very big hazard." Hr'g Tr. 157. He testified that when he saw the coal spill at 10:40 a.m. the amount of accumulations was "a pretty good size." Hr'g Tr. 156-57. There was coal spilled along both sides of the main belt, spanning 5 to 10 feet, as well as behind it and underneath the head area of the temporary belt, where accumulations piled from 10 to 18 inches such that the temporary belt was sitting on top of the coal. Both witnesses had years of mining experience, but the ALJ's weighing of their testimony, when explained as here to credit Inspector Law's opinion, is entitled to deference. *Cf. Prairie State*, 792 F.3d at 89; *Black Beauty*, 703 F.3d at 559–60.

Further, the ALJ could reasonably conclude that Mach's decision to turn off the main belt no more served to show that it was not highly negligent. Shutting off the main belt "neither *prevented* nor *corrected* the hazardous condition." *Mach Mining*, 36 FMSHRC at 2543. Instead, the ALJ concluded, the fact that Mach needed to stop production to correct the dangerous condition it had allowed to persist indicated how negligent Mach had been. Upon turning off the belt, Mach took no further step to clean up the accumulations.

*Charging station*.  The ALJ rejected Mach's view that it was not highly negligent because the charging station was locked and functionally unusable at the time the inspector discovered it in the primary escapeway on November 17. Mach's view is that if locking a charging station is enough to terminate a citation, then it must be enough to reduce high negligence to a lower form of negligence.  Mach is correct that when the agency misleads a mine operator — either with inconsistent enforcement of the regulatory provision or with ambiguous interpretations in the agency manual — that circumstance may reduce the level of negligence and penalty amount for a violation.  *See Mettiki Coal Corp.*, 13 FMSHRC 760, 770–71 (1991); *U.S. Steel Mining Co.*, 6 FMSHRC 2305, 2310 (1984); *King Knob Coal Co.*, 3 FMSHRC 1417, 1422 (1981).  That is, "although an incorrect interpretation of a regulatory requirement by an MSHA official does not have the force and effect of law and will not serve to negate liability for violative conduct, detrimental reliance on that interpretation is properly considered in mitigation of penalty."  *U.S. Steel Mining*, 6 FMSHRC at 2310.

The ALJ recognized that reliance could be a basis for reducing a high negligence determination, but found no evidence Mach had relied on the prior termination.  This finding is supported by substantial evidence in the record.  Mach's manager did order the station be locked when he discovered the non-compliant station, but the ALJ rejected Mach's "late-in-the-game attempt to rely on the abatement required for the October 28 citation."  *Mach Mining*, 36 FMSHRC at 2546.  In view of the plain text of the regulation, the ALJ reasoned, "Mach knew or should have known the charger could . . . not be in the escapeway regardless of whether it was locked."  *Id.*  Mach's manager admitted he knew the charging station should not be in the escapeway, acknowledging that locking it was the next best option to full compliance, which required moving the station or

putting it behind an air lock. Nothing in the record indicates the manager's half-measure of locking the charging station was based on the terminated citation. Nor is there evidence that the charging station was returned to the primary escapeway, after being repaired following the October 28 citation, based on "MSHA's allegedly inconsistent guidance." *Id.* The record is silent on who ordered the station to be returned to the escapeway or for what purpose.

To the extent Mach contends that the ALJ erred in requiring a showing of actual detrimental reliance, it fares no better. The Commission has found less than high negligence where the mine operator "did not show actual reliance," focusing instead on what the operator knew or should have known about the "appropriate standard of care." *See King Knob Coal*, 3 FMSHRC at 1422; *Mettiki Coal*, 13 FMSHRC at 771. Even assuming Mach partially complied with the standard of care under 30 C.F.R. § 75.380(f)(3)(iii) when it locked the charging station, Mach offered no evidence the station was continuously locked during the period between the termination of the prior citation and the issuance of the new citation. Rather, Mach's manager admitted that he had the station locked only a few days before the citation was issued. Mach's suggestion that this temporary lapse should be forgiven because "there is no evidence that any agent of Mach was aware the charging station was or was planned to be returned to the primary escapeway," defies reason, as well as the purpose of the Mine Act. It cannot be that a mine operator's *failure* to keep track of equipment that can pose a danger to miners when it is in the wrong place, *see* 30 C.F.R. § 75.380(f)(3)(iii), has made that operator less negligent.

**B.**

The "significant and substantial" designation stems from section 104(d)(1) of the Mine Act, which distinguishes between a violation of a mandatory health and safety standard that causes

imminent danger and those that do not but nonetheless are "of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard." 30 U.S.C. § 814(d)(1); *see id.* § 814(e)(1). It subjects a mine operator to a withdrawal order, and higher civil penalties, if subsequent inspections reveal further violations of the standards. *See* 30 U.S.C. §§ 814(d), (e), 820(a)(3); *Cyprus Emerald Res. Corp. v. Fed. Mine Safety & Health Review Comm'n*, 195 F.3d 42, 43 & n.1 (D.C. Cir. 1999); *Sec'y of Labor v. Fed. Mine Safety & Health Review Comm'n*, 111 F.3d 913, 915 (D.C. Cir. 1997). Mach does not dispute that whether a violation is serious enough to be "significant and substantial" is governed by the four-element test in *Mathies Coal Co.*, 6 FMSHRC 1, 3–4 (1984). A violation is "significant and substantial" if there is (1) a violation of the underlying mandatory safety standard; "(2) a discrete safety hazard — that is, a measure of danger to safety — contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature." *Id.* at 3–4; *Amax Coal Co.*, 19 FMSHRC 846, 848 (1997). "[R]easonable likelihood" is something less than "more probable than not." *See Amax Coal*, 19 FMSHRC at 848–49. Instead, Mach maintains that the Secretary failed to prove the third element of the *Mathies* test because there was insufficient evidence the main belt had been operating in the coal accumulations for a long time prior to the citation or would do so again in the future, and because a belt fire was less likely to occur because the accumulations were wet and contained relatively little coal. Although Mach may be correct that it is not possible to know with certainty how long the main conveyor belt had been operating in the presence of the accumulations, the ALJ could reasonably conclude, for the reasons discussed, that the accumulations were extensive and had been present for a significant period of time.

Notably, Mach's focus on the length of time that the accumulations had been present misunderstands the "significant and substantial" inquiry. That inquiry considers "the violative conditions as they existed both prior to and at the time of the violation and as they would have existed had normal operations continued." *Knox Creek Coal Corp.*, 36 FMSHRC 1128, 1132 (2014); *McCoy Elkhorn Coal Corp.*, 36 FMSHRC 1987, 1991 (2014). Even if there is a dispute about how many hours the belt was operating in accumulations, there can be no dispute that at the time of the shut down the belt was operating in the accumulations and would do so again if the belt were turned back on. The Commission "has expressly rejected the argument that 'accumulations of combustible materials may be tolerated for a reasonable time.'" *Knox Creek Coal*, 36 FMSHRC at 1141 (internal quotation marks and citation omitted); *cf. Black Beauty*, 703 F.3d at 558. So, the fact that Mach turned off the main belt at some point prior to the citation does not mean that the ALJ erred in concluding the violation was "significant and substantial." In *McCoy Elkhorn*, the Commission upheld a "significant and substantial" determination even though the citation was issued when the mine operator was cleaning up the accumulations and there were no ongoing mining operations. 36 FMSHRC at 1991; *Knox Creek Coal*, 36 FMSHRC at 1141. Because the "significant and substantial" determination "must be made at the time the citation is issued '*without any assumptions as to abatement*,'" *McCoy Elkhorn*, 36 FMSHRC at 1991 (quoting *U.S. Steel Mining Co.*, 6 FMSHRC 1573, 1574 (1984)), neither the inspector nor the ALJ could assume that Mach would complete cleaning up the accumulations prior to resuming mining activities just because Mach had made some effort to clean up accumulations at the time it was cited.

Finally, Mach insists that the danger presented by these coal accumulations was minimal because they were wet, and rock, not coal, made up a significant portion of the accumulations. It

offers no basis for the court to conclude that the ALJ's findings that the accumulations were mostly coal and were not rock dusted were not supported by substantial evidence. The ALJ's determination that the violation was "significant and substantial" rests on a judgment that is supported by Commission precedent. "[W]et coal accumulations pose a significant danger in underground coal mines." *Consolidation Coal Co.*, 2013 WL 4648491, at *3 (FMSHRC Aug. 14, 2013). Wet coal, at best, delays combustion because "accumulations of damp or wet coal can dry out and ignite." *Amax Coal Co.*, 19 FMSHRC at 848–49 (citing *Mid-Continent Res., Inc.*, 16 FMSHRC 1226, 1230 (1994)). Here, wet coal was found near an ignition source (a running conveyor belt). *See Mid-Continent Res., Inc.*, 16 FMSHRC 1218, 1222 (1994); *Amax Coal*, 19 FMSHRC at 848–49.

Accordingly, because substantial evidence supports the ALJ's findings for the "high negligence" and the "significant and substantial" determinations, we deny the petition for review.